## UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No.  07-10234-01, 02-MLB |
| | ) |
| STEPHEN J. SCHNEIDER, and | ) |
| LINDA K. SCHNEIDER, a/k/a, | ) |
| LINDA K. ATTERBURY, | ) |
| d/b/a SCHNEIDER MEDICAL | ) |
| CLINIC | ) |
| | ) |
| Defendant. | ) |
| | ) |

## <u>MEMORANDUM AND ORDER</u>

## I.  NATURE AND HISTORY OF PROCEEDINGS.

Defendants were charged by Indictment filed December 20, 2007, with multiple counts of conspiracy, unlawful distribution and dispensing of controlled substances, health care fraud, money laundering and illegal monetary transactions.  (Doc. 2.)  On the same day, the Government filed its Motion for Special Conditions of Release, In Lieu of Detention.  (Doc. 1.)  The motion sought eight (8) special conditions of release which the Government argued should be imposed if Defendant Stephen Schneider was to be released on conditions.[1]  (Doc. 1 at 10.)

On December 21, 2007, Defendants appeared for a detention hearing.  (Doc's 3,

---

[1]  The Government's motion did not mention Defendant Linda K. Schneider because the Government had moved to revoke her probation in an earlier case, Case No. 06-10106-01-MLB.

6.)  The Government appeared through Tanya Treadway, Assistant United States Attorney.  Defendant Stephen Schneider appeared through appointed counsel Jay Greeno; Defendant Linda K. Schneider appeared through appointed counsel John Rapp.  After hearing proffers and statements of counsel, the Court denied the Government's motion for special conditions of release and ordered Defendants to be detained pending trial.  (Doc's 10, 11.)

On January 7, 2008, the Government filed an unopposed motion to designate this case as a complex case.  (Doc. 14.)  An Order granting the motion was filed the next day. (Doc. 15.)

On January 11, 2008, the Government filed a Motion to Revoke Appointment of Counsel and for Reimbursement of Attorneys Fees.  (Doc. 16.)  A hearing on the motion was held on January 16, 2008, and another hearing was set for March 3, 2008.  (Doc's 19, 20.)

On January 22, 2008, the Government filed an unopposed motion to preserve potential evidence and assets (Doc. 22).  The motion was subsequently granted on February 11, 2008.  (Doc. 26.)

On February 7, 2008, Lawrence W. Williamson, Jr. entered his appearance for Stephen J. Schneider, and on February 8, 2008, Uzo L. Ohaebosim entered his appearance for Linda K. Schneider.  (Doc's 23, 25.)  As a result, the two counsel who had previously been appointed to represent the Defendants were both allowed to withdraw.  (Doc's 28, 29.)

At the March 3, 2008 continued hearing on the motion to revoke appointed counsel and for reimbursement of attorneys fees, Defendants acknowledged that the issue

concerning revocation of appointed counsel is moot due to the fact that Defendants have now retained counsel.  Defendants' also stated that they did not oppose entry of an order requiring Defendants to reimburse the United States for the cost of services provided by their prior appointed counsel: provided however, that Defendants also sought (1) an order of the Court ruling on the continued availability of those substitute assets identified by the Government in their motion (or the liquidated value of those "substitute" assets) for use to pay retained counsel and any experts employed by retained counsel, and (2) an appropriate time period in which to liquidate such assets and make the required reimbursement to the United States.  The Court then entered an order directing that any additional briefs by any party concerning the availability of substitute assets be filed on or before March 10, 2008; directing that each Defendant be provided a copy of the CJA invoice for counsel appointed for that Defendant and the opportunity to object to any portion of the billing that Defendants believed to be unreasonable in nature or amount; and giving Defendants seven (7) days (calendar days including weekends) after receipt of the CJA invoice within which to file any objections.  (Doc. 35.)  On March 10, 2008, Defendants filed a Supplemental Motion on the status of substitute assets, expressing concern about the possible future treatment of those assets by the Government.  (Doc. 44.)

At the March 3, 2008 hearing, Defendants' counsel also indicated for the first time that they intended to file a motion seeking to reopen the detention hearing as to both Defendants.  Subsequently, on March 7, 2008, both Defendants filed motions for release on their own recognizance and/or to set bond pursuant to 18 U.S.C. § 3142, together with

supporting memoranda.  (Doc's 39, 40, 41, 42.)[2]  The Government filed a response in opposition to the motions for bond along with supporting exhibits (Doc. 45 and Minute Entry 3/14/2008 re Exhibit 1 to be filed conventionally.)[3]

A hearing was held on the pending motions on March 14, 2008.  (Doc's 47, 48.) The Government appeared at the hearing through counsel Tanya Treadway, Assistant U.S. Attorney;  Defendant Stephen Schneider appeared through retained counsel Lawrence Williamson; Defendant Linda Schneider appeared through retained counsel Uzo Ohaebosim, and through counsel admitted *pro hac vice*, Kevin P. Byers and Eugene V. Gorokhov.  Counsel for each Defendant was provided with a copy of the CJA voucher which had been approved for appointed counsel.  Any objections to the reasonableness of these vouchers was to be submitted not later than March 21, 2008.

The Court then proceeded to hear testimony from any witnesses.  Defendant Linda K. Schneider called Kerin Schell, a psychologist, as a witness to testify concerning the mental condition of Linda Schneider during her detention.  A partial transcript of the March 14 hearing which includes Kerin Schell's testimony has been filed with the Clerk. (Doc. 50) (Sealed).  As part of cross-examination of Schell, counsel for the Government asked about the witness's knowledge of the circumstances leading up to his examination

---

[2] Defendant Linda K. Schneider subsequently filed an Errata version of her memorandum (Doc. 43) which changed only the organization of the memorandum and not the substance.  The Court will cite to the initial memorandum unless otherwise noted.

[3] On a related matter, on March 7, 2008, the Government also filed a Motion for Determination of Conflict and supporting memorandum together with attached exhibits. (Doc. 38.)  One of those exhibits was a CD with excerpts of telephone calls from the jail by Defendants.  (Minute Entry, 3/7/2008, Exhibit 7 to Doc. 38 to be filed conventionally.) The Court, in ruling on the present motions for bond, has also reviewed that exhibit.

of Linda Schneider.  (Doc. 50 at 24-27) (Sealed.)  Defendants objected and the

Government proffered evidence from recordings of telephone calls from the jail.  While

the Government had previously filed and/or tendered a CD with numerous recordings of

jail telephone calls for the Court's examination,[4] the Government could not recall whether

the specific telephone call or calls referenced by the Government's proffer were included

in those prior recordings.  The Government indicated that it would check and make that

tape available.[5]  The Court allowed the Government's cross examination to proceed based

upon its proffer.

No other witnesses were called to testify.  After hearing testimony, proffers and

arguments of counsel, the Court took under advisement the motion concerning

reimbursement of attorneys fees for appointed counsel (Doc. 16), and the motions for

release of defendants on bond (Doc's 39-43), and indicated that it would rule on those

matters by means of a written order.

Finally, before the Court could issue its written order on these pending motions,

the Government filed a motion for a psychiatric examination of Defendant Linda K.

Schneider to determine her ability to assist in the preparation of her defense.  (Doc. 51.)

Defendant Linda K. Schneider responded to that motion.  (Doc. 53.)  The assigned trial

---

[4]  The Government also provided that CD to Defendants' counsel as part of the discovery in the case.

[5]  On March 17, 2008, the Government filed a motion to supplement the record with evidence to support its oral proffer made during the March 17 hearing.  (Doc. 46.) Defendants have not filed a response or objection.  Therefore the motion to supplement (Doc. 46) is hereby GRANTED and the exhibit attached to the motion shall be filed conventionally with the Clerk of the Court.

judge has now granted that motion for a psychological examination and evaluation while

Defendant Linda K. Schneider is in custody (Doc. 56), and has directed that the

undersigned magistrate judge's ruling on her pending motion for release on bond be

"suspended pending defendant's evaluation so that he may consider the results of the

evaluation."  (Doc. 56 at 3.)

## II.  REIMBURSEMENT OF ATTORNEYS FEES
## FOR APPOINTED COUNSEL

Counsel for both Defendants have advised the Court by e-mail transmissions on

March 19, 2008 and March 24, 2008, that they have no objections to the reasonableness

of the fees charged by appointed counsel in this case and approved by the Court.

Therefore, the Court hereby directs and orders Defendant Stephen J. Schneider to pay into

the registry of the Court for deposit in the Treasury, the sum of $3,585.45 to reimburse

the Government for the cost of prior appointed counsel and investigative costs pursuant to

18 U.S.C. § 3006A(f).  The Court further directs and orders Defendant Linda K.

Schneider, a/k/a Linda K. Atterbury, to pay into the registry of the Court for deposit in the

Treasury, the sum of $2,377.24 to reimburse the Government for the cost of prior

appointed counsel  pursuant to 18 U.S.C. § 3006A(f).   *See e.g.*, United States v.

Simmers, 911 F.Supp. 483 (D. Kan. 1995).

Considering the amounts involved, Defendants are hereby given until June 20,

2008 to liquidate assets necessary for payment of these expenses and to tender payment in

the amounts set out above to the Clerk of the U.S. District Court for the District of

Kansas.

6

The Court has also considered Defendants' request for a ruling concerning future treatment of substitute assets.  The Government has conceded, on the record, that all assets identified as substitute assets on Exhibit 1 to the Memorandum in Support of the Government's Motion to Revoke Appointment of Counsel and for Reimbursement of Attorneys Fee's (Doc. 16-2 at 3-6) cannot presently be reached or restrained by the Government by means of a present lien or notice of *lis pendens* pursuant to the Tenth Circuit's holding in United States v. Jarvis, 499 F.3d 1198 (10th Cir. 2007).  Likewise, no interest of the Government in substitute assets identified in the Indictment would "relate back" to the date of the alleged offense and the Government's interest "cannot mature into an actual interest until after conviction and does not relate back to a pre-conviction date . . . ." Jarvis, 499 F. 3d at 1205.

Defendants remain concerned, however, that the Government might change its mind in the future and might, by means of a superseding indictment or in some other manner, re-categorize the present substitute assets into assets which are forfeitable outright.  *See e.g.*, Fed. R. Cr. P. 32.2(e).  In that event, Defendants are concerned whether any substitute assets that have already been liquidated and used to pay fees of retained counsel or experts and consultants remain free and clear of any future claim of forfeiture by the Government or whether the assets might be recouped or reclaimed by the Government.  Defendants therefore request "a definitive statement by the court based on an interpretation of *Jarvis* and other controlling case law which will resolve the present conflict by determining the parties' respective rights with respect to the assets." (Doc. 44

7

at 3.)  Defendants reiterate that they "are not asking for a guarantee on all future assets, but just those identified in the government's motion regarding repayment."  (Doc. 44 at 3 n. 2.)  Defendant base their "concerns" on perceived ambiguities as to the holding in Jarvis, since it involves New Mexico procedures for *lis pendens,*[6] whereas the property at issue in the present case is located in Kansas, Oklahoma and the Country of Mexico, and on the fact that other circuits take a different view on the issue of relation-back as to substitute assets.  (Doc. 44 at 4.)[7]

While other courts may have come to a different conclusion about substitute assets than the Tenth Circuit's decision in Jarvis, this Court has followed Jarvis and refused to allow pretrial restraint of substitute assets.  United States v. Wittig, 525 F. Supp.2d 1281 (D. Kan. 2007).  Wittig presented a complicated factual situation in where the Government, after appeal and reversal, argued that "defendant's interest in assets subject to forfeiture are all 'back in play, as if no trial had been held.'" 525 F.Supp. 2d at 1286. The Court, however, continued to view defendant's assets as substitute assets and denied the Government's request for reinstatement of its restraining order and a broad restraint on those assets.  525 F.Supp. 2d at 1289.

---

[6] The Court recognizes that some courts allow the filing of *lis pendens* on substitute property because *lis pendens* is not considered a "restraint."  *See e.g.*, Cassella, ASSET FORFEITURE LAW IN THE UNITED STATES at 526, § 17-8  n.78 (citing cases).

[7] The Court also recognizes that courts in the Fourth Circuit and a handful of district courts have permitted the pre-trial restraint of substitute assets. *See e.g.*, Cassella, ASSET FORFEITURE LAW IN THE UNITED STATES, § 17-14 at 535-36, n.104 (citing cases).

In opinions prior to Jarvis, the Tenth Circuit discussed the possibility that a defendant might not be able to retain counsel even if there was no pre-trial restraining order in place concerning forfeitable assets because the "indeterminate status of assets may make them unavailable." U.S. v. Nichols, 841 F.2d 1485, 1506 n. 12 (10th Cir. 1988). That has not happened in the present case, however, because present counsel entered their appearance in this case after the Government had stated its position concerning the availability of substitute assets at the January 16, 2008 hearing on the Government's motion to revoke appointment of counsel, and did so without any guarantee as to the future status of the identified substitute assets. Thus, while retained counsel argue that the uncertainty about the future treatment of substitute assets is of great concern to them, this uncertainty did not prevent them from voluntarily entering their appearance in this case as counsel. While the Court is not unsympathetic with counsel's concerns, the Court cannot give counsel or defendants the guarantee they seek in this case about any future treatment of the substitute assets identified by the Government on Exhibit 1 to the Memorandum in Support of the Government's Motion to Revoke Appointment of Counsel and for Reimbursement of Attorneys Fee's (Doc. 16-2 at 3-6). The Court simply cannot issue an advisory ruling based upon hypothetical future events.

### III.   REOPENING OF DETENTION HEARING

A detention hearing may be reopened at any time before trial

> if the judicial officer finds that information exists that was not
> known to the movant at the time of the hearing and that has a
> material bearing on the issue whether there are conditions of
> release that will reasonably assure the appearance of such
> person as required and the safety of any other person and the
> community.

18 U.S.C. § 3142(f).  This provision has been interpreted strictly so as to deny a

reopening where the evidence relied upon was available at the initial detention hearing.

U.S. v. Whittenmyer, Case No. 00-40024-14-SAC, 2001 WL 968406 at * 3 (D. Kan. Jul.

6, 2001) (citing U.S. v. Ward, 63 F.Supp.2d 1203, 1206, (C.D.Cal. 1999)), U.S. v. Dillon,

938 F.2d 1412, 1415 (1st Cir. 1991); and U.S. v. Hare, 873 F.2d 796, 799 (5th Cir. 1989)).

See also U.S. v. Roberts, No. 03:98-CR-121, 2007 WL 30889 (E.D.Tenn. Jan. 4, 2007).

The Court first notes that, as was the situation in Dillon and Ward, we now have

new counsel for Defendants who enter the case after the initial detention hearing has been

held.  These new counsel suggest, albeit indirectly, that prior appointed counsel did not

raise all the issues that should have been raised in the prior detention hearing.  See e.g.,

Doc. 41 at 2 ("due process arguments were not raised at the first hearing . . . ."); Doc. 40

at 1-2, 4  ("the record of that prior hearing indicates that the Magistrate Judge did not

have the benefit of a thorough presentation as to why Ms. Atterbury should be released . .

.." and "the Court was woefully underinformed as to the legitimate, verifiable bases upon

which to grant a conditional release to the defendant.")  The Court categorically rejects

any suggestion that appointed counsel for these defendants did not adequately perform their responsibilities at the prior detention hearing.  Furthermore, simply hiring new counsel who, with the luxury of additional time, may construct arguments not previously made at the initial detention hearing, is not a valid reason for reopening a detention hearing.  If defendants believed that there were errors in the prior hearing, they had every right to seek a review of the order of detention pursuant to 18 U.S.C. § 3145(b) by the trial judge.  Had they done so, the trial judge would have decided the matter on a *de novo* basis and could have allowed any additional argument or evidence the Court deemed relevant to the issue of detention.  Instead, Defendants chose to ask to reopen the detention hearing.  To do so, they must meet the standard set out in the Bail Reform Act, 18 U.S.C. § 3142(f).  United States v. Cisneros, 328 F.3d 610, 614 (10th Cir. 2003) (contrasting the two avenues for reconsideration of a release or detention order and noting that where the detention hearing is to be reopened under 3142(f), such a reopening is permissible only where there is new information that would materially influence the decision concerning release or detention).

Defendants argue that several pieces of new information exist that were not known at the detention hearing and that are material to the question of detention.  They include: (1) the temporary suspension of Stephen Schneider's license to practice medicine; (2) the fact that the Schneider Clinic is now completely closed; (3) the designation of this as a

complex case, and finally (4) the due process argument.[8]  The Government counters that

none of these are new events which justify reopening the detention hearing.

As to the temporary suspension of Stephen Schneider's medical license, and the

related offer to surrender his DEA license to prescribe controlled substances,[9] these

matters were clearly part of the arguments at the initial detention hearing.  At that time,

Stephen Schneider offered to surrender these licenses if it was necessary for him to obtain

his release.  Furthermore, these matters were specifically considered by the Court in

deciding to detain defendants.  Therefore, this is not new information.  In fact, since

Stephen Schneider's medical license has only been *temporarily* revoked by the State of

Kansas, in some regards there is even more uncertainty now than there was when he

offered to voluntarily surrender his license at the initial detention hearing.[10]

---

[8]  Linda Schneider also wants to revisit the Government's arguments from the
initial detention hearing that the defendants' erratic behavior on the day of their arrest
indicated that they were being evasive and suggested that they might be preparing to flee.
None of the Linda Schneider's arguments (Doc. 40 at 2-3) concerning this event are new
and all of that information was clearly known to Defendants at the time of the initial
detention hearing.  A request to reopen a detention hearing is not a "do-over."  Linda
Schneider also argued at the March 14 hearing that the testimony of Kerin Schell, a
psychologist, concerning Linda Schneider's mental condition was new information that
justifies reopening the detention hearing.  Because the trial judge has ordered a
psychological examination and evaluation of Linda Schneider, the Court will withhold
any consideration of that argument until after the ordered psychological examination has
been conducted.

[9]  Defendant Stephen Schneider represents that he "stands ready to surrender his
DEA number if the government reconsidered its position on bond."  (Doc. 42 at 19 n. 10.)

[10]  Defendants do not address what would happen if Stephen Schneider is able to
reverse the state board's decision and reinstate his medical license.  Counsel for
Defendant Stephen Schneider did state at the March 14 hearing that if Defendant's

The closing of the Schneider Clinic is something that has occurred after the detention hearing.  At the time of the initial hearing, the Clinic was still being operated by other medical personnel acting on behalf of Stephen Schneider (and apparently using Stephen Schneider's medical license as a basis for continued operation of the Clinic). The Court was concerned as to how it could effectively monitor Defendants to reasonably assure that they would not continue to operate the Clinic and to dispense controlled substances directly, or through other medical personnel operating the Clinic.  (Doc. 10 at 10-11.)  To some degree, that concern has been diminished as a result of the closing of the Clinic.  As will be noted later, however, there is some indication that Defendants are still trying to find some way to operate the Schneider Clinic through the use of others. Also, as previously noted, if Stephen Schneider's license should be reinstated, it is clear to the Court that defendants would reopen the Clinic as soon as possible.  However, for purposes of deciding whether there is a basis for reopening the detention hearing, the closure of the Clinic is a new fact that materially influences the Court's judgment about whether there are conditions of release that will reasonably assure the safety of the community.

Also, the designation of this case as a complex case for case management purposes is something that has occurred after the initial detention hearing.  Defendants' own counsel have not opposed the complex case designation and in status conferences have

---

medical license was reinstated and the Clinic reopened, the Court could then reopen the detention hearing.

indicated that they will require a substantial period of time to prepare the defense for both defendants. To the extent that this factor is related to the due process arguments made by defendants, they will be discussed together.

Defendants cite cases where varying periods of detention have been considered to be so excessive and punitive as to violate a defendant's Fifth Amendment due process rights. (Doc. 40 at 14-16; Doc. 42 at 20-21.) The periods of detention involved in those cited cases range from 8 months to 9½ months. United States v. Gallo, 653 F. Supp. 320, 343-35 (E.D.N.Y. 1986) (8 months); United States v. Shareef, 907 F. Supp. 1481, 1485-87 (D. Kan. 1995) (approximately 8 months); United States v. Lofranco, 620 F. Supp. 1324, 1325-26 (N.D.N.Y. 1985) (9½ months). Defendants also cite United States v. Theron, 782 F.2d 1510, 1516 (10th Cir. 1986), where the defendant had been incarcerated for approximately four months and was expected to be detained another four months before trial. While Theron did cite cases involving due process considerations, it was decided based on provisions of the Speedy Trial Act where co-defendants who were not detained had requested additional time to prepare for trial. The Court was careful to note that it was not establishing a "bright line" and relied on the specific facts presented where the delay was caused by co-defendants, the petitioning defendant had opposed all continuances, had sought to sever his case from the co-defendants, had taken no steps that would delay trial, and had announced that he was ready to go to trial. Id. Thus, the four-month period of detention plus an additional month to proceed to trial in Theron cannot be taken as any bright line for application to the present case.

14

The Tenth Circuit has noted that a district court is not required to consider the length of pretrial detention when making its initial detention decision, but that after some period of detention it may be appropriate to reopen the detention hearing to consider the due process considerations of any future detention.  United States v. Cos, 198 Fed. Appx. 727, 733 (10th Cir. 2006).  If the hearing is reopened, in analyzing any due process claims, the court is to consider three factors:  (1) length of confinement and any non-speculative expected confinement; (2) the Government's responsibilities for delays in the proceedings; and (3) the strength of the evidence supporting detention.  *See also* United States v. Cos, No. CR 05-1619-JB, 2006 WL 4061168 at * 3 (D.N.M. Nov. 15, 2006).[11]

The Court does not believe that defendants have established at this time that their detention has been so lengthy that it warrants a reopening of their detention hearing.  This is particularly true since Defendants themselves elected not to seek an earlier release on bond but rather to stay in jail.  In telephone calls by Defendants during the period after they were detained, both Defendants stated that they did not want out of jail, could sit in jail as long as it was needed, and didn't mind staying in jail if its for the cause.  *See* Calls # 5D-1 and 5-E (Linda Schneider); Call # 20B (Stephen Schneider).  As previously noted, nothing prevented Defendants from seeking an immediate review of the order of

---

[11]  In Cos, the defendant had been held in pre-trial detention for almost 14 months at the time the Tenth Circuit ruled on the mandamus issue.  198 Fed. Appx. at 732.  On remand to the District of New Mexico, the trial judge applied the applicable standards and held that defendant had not established that his period of detention had yet violated his due process rights and he was to remain detained.  2006 WL 4061168 at * 23.

15

detention by the assigned district judge if they believed that they were wrongfully detained.  They did not do this and did not file the present motions for bond until March 7, 2008.  Thus some of their arguments about the length of detention ring hollow.

On the other hand, the trial judge has now set a trial date for February 2009. Therefore, if Defendants continue to be detained through trial, they will have been held in pretrial custody for approximately fourteen months by the time trial commences.[12]  The Court is not prepared to determine that such a period of pretrial detention is, *per se*, excessive or punitive in nature.  *See e.g.*, United States v. Cos, 198 Fed. Appx. 727, 733 (10th Cir. 2006);  United States v. Cos, No. CR 05-1619-JB, 2006 WL 4061168 at * 3 (D.N.M. Nov. 15, 2006).  *See also* U.S. v. Hightower, 203 F.3d 836 (Table), 2000 WL 136813 (10th Cir., Feb. 7, 2000) (noting prior Tenth Circuit cases where prolonged periods of pretrial detention for as much as thirty-two and thirty-four months were found not to be punitive for purposes of a due process analysis).  However, because the Court has determined that it is appropriate to reopen the detention hearing in this case, the Court will consider the length of pretrial confinement as one factor to consider in deciding whether Defendants should be released.

In conclusion, the Court finds that the closing of the Clinic is new information that

---

[12]  Defendants' counsel have not objected to the timing of the trial date.  It is true, however, that, to some extent, the Government is responsible for approximately three months of delay in the trial setting.  The trial judge proposed a November 2008 trial date, but the Government sought additional time due to the trial of another major case. Thus both parties are somewhat responsible for delays that impact the period of Defendants' detention.

is material to issues of detention such that defendants are entitled to reopen their detention hearing. Therefore, the Court will consider the evidence, proffers and arguments made at the March 14, 2008 hearing to determine whether Defendant Stephen Schneider should be released on bond or on some conditions of release. As previously noted, however, any similar analysis as to Defendant Linda K. Schneider will be deferred at the direction of the trial judge until after her psychological examination and evaluation has been completed.[13]

## IV.  CONSIDERATION OF RECORDED TELEPHONE CALLS FROM THE BUTLER COUNTY JAIL

In determining whether Defendant Stephen Schneider should be released, the Court must next decide what evidence and proffers presented by the Government in their briefing and at the March 14, 2008 hearing can be considered on the issue of detention. Defendants argue that the Government's reliance on recordings made by the Butler County Jail of telephone calls between Defendants and their family members or other non-attorneys can not be considered in deciding the detention issue because the recording of these calls violates Title III, 18 U.S.C. § 2510, *et.seq.*  Defendants also argue that while the jail may be able to legally record and monitor Defendants' calls, that information

---

[13]  Defendant Linda Schneider's motion also involves legal issues not applicable to Defendant Stephen Schneider. For example, the hearing on March 14 was combined with the detention issues in Linda Schneider's earlier case, No. 06-10106-01-MLB, where the Government has moved for revocation of Linda Schneider's probation. Detention in such a case is governed by different burdens of proof. *See* Fed. R. Cr. P. 32.1(a)(6) and 18 U.S.C. § 3143(a) (requiring a finding "by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person" if released).

should not be shared with federal authorities.  Finally, Defendants ask for discovery to

explore how the prosecutors in this case obtained copies of the recordings.[14]

Defendants made their objections to the recorded phone calls orally and they cited

no authorities other than the wire-tap statute to support their position.  The Court has

determined, however, that there is authority on this point in the Tenth Circuit.  In <u>United</u>

<u>States v. Gangi</u>, 57 Fed. Appx. 809 (10th Cir. 2003), the Tenth Circuit followed the

reasoning and conclusions of the Ninth Circuit concerning the admissibility of tape

recordings of prisoner telephone calls.  57 Fed. Appx. at 813-14.  The Tenth Circuit noted

that in <u>United States v. Van Poyck</u>, 77 F.3d 285 (9th Cir. 1996), the Ninth Circuit

concluded that two exceptions to Title III permitted the taping of inmate calls: (1) section

2510(5)(a) which excludes from Title III any facility used by an investigative or law

enforcement officer in the ordinary course of his duties; and (2) section 2511(2)(c) which

---

[14] Defendants also argued that the recording of their phone calls impacted their Sixth Amendment right to counsel and chilled their First Amendment rights.  As to the Sixth Amendment claim, none of the phone calls were between Defendants and an attorney.  While family members who were seeking to retain new counsel for Defendants discussed the hiring of counsel with Defendants in several phone calls, this appeared to be informational only and in no way directly impacted Defendants' Sixth Amendment rights.  As to the First Amendment chilling claim, while imprisonment does not automatically deprive a prisoner of constitutional protection, the Courts owe substantial deference to the professional judgment of prison administrators, and restrictive prison regulations are permissible if they are reasonably related to legitimate penological interests.  <u>Beard v. Banks</u>, 548 U.S. 521, ___, 126 S.Ct. 2572, 2577-78 (2006) (citing <u>Turner v. Safley</u>, 482 U.S. 78 (1987) and <u>Overton v. Bazzetta</u>, 539 U.S. 126 (2003)); <u>Wardell v. Duncan</u>, 470 F.3d 954, 959-60 (10th Cir. 2006).  Defendants have not presented a convincing argument as to why the recording and monitoring of phone calls in this case were not reasonably related to legitimate penological interests.

excepts interceptions where there has been prior consent, either express or implied in fact from surrounding circumstances, which indicate that the defendant knowingly agreed to the surveillance.   In Gangi, the Tenth Circuit concluded that defendant had impliedly consented to the monitoring of his telephone calls from jail where the record supported the inference that defendant knew and understood that the calls were being monitored from signs in areas of the jail where he had previously been housed.   Therefore, Title III did not require suppression of the calls.   In addition, the Tenth Circuit also concluded that it was not objectively reasonable for defendant to expect that there would be privacy in his calls while at the jail and, as a result, the Fourth Amendment is not triggered by the routine taping of such calls.   57 Fed. Appx. at 815.   *See also* United States v. Peoples, 71 F. Supp.2d 967 (W.D.Mo. 1999); United States v. Rantz, No. 85-40036-01-RDR, 1985 WL 8035 * 4 (D. Kan. Sep. 30, 1985) (finding that where defendant was specifically informed of the practice of monitoring telephone calls his use of the phone constituted consent to the monitoring).

   In this case, it is clear that Defendants knew that all of their phone calls with family members were subject to monitoring and recording by the jail.   An announcement to that effect was made prior to the connection of each phone call as disclosed on the tape recordings provided by the Government.[15]   Furthermore, Defendants mentioned in several

---

[15] In reviewing the full recordings of the calls from which the "clips" were taken, *see* note 16 *infra*, the Court notes that each call was preceded with the announcement that the call may be subject to monitoring and recording.

of their calls that they knew the calls were being recorded and cautioned the other party about what could be said.  Therefore, under <u>Gangi,</u> Defendants' arguments that the phone calls violated Title III are not persuasive.

Defendants' argument that the information from the recorded phone calls should not have been shared with law enforcement personnel is likewise unavailing.  Again, Defendants cited no specific legal authority for their argument.  This Court has, however, addressed that issue.  In <u>United States v. Rantz</u>, No. 85-40036-04, 1985 WL 8035 (D. Kan. Sep. 30, 1985), the Court refused to suppress the contents of taped phone conversations made from prison where the prison officials allowed the calls to be reviewed by law enforcement agents.  1985 WL 8035 at * 4.  In so holding, this Court followed the Third Circuit's opinion in <u>United States v. Iannelli</u>, 477 F.2d 999 (3rd Cir. 1973), *aff'd on other grounds*, 420 U.S. 770 (1975), which held that 18 U.S.C. § 2517(1) authorized the disclosure of electronic surveillance information to IRS agents and that even if there was an improper disclosure, suppression of that evidence is not required.  *Id.*

The Court, however, does not need to delve into the intricacies of Title III and whether the prosecutor was entitled to the recorded phone calls or not or whether such evidence could be suppressed at the time of trial.  The Tenth Circuit has held that in a detention hearing the judge may consider evidence which a party is seeking to have suppressed.  *See* <u>U.S. v. Pina-Aboite</u>, 97 Fed. Appx. 832, 2004 WL 1053235 (10th Cir., May 11, 2004) (authorizing a court to consider evidence in a detention hearing which the trial court had already suppressed and where the suppression order was on appeal); <u>U.S.</u>

v. Hightower, 203 F.3d 836 (Table), 2000 WL 136813 (10th Cir., Feb. 7, 2000).  These rulings are consistent with the fact that the Federal Rules of Evidence are not applicable to detention hearings.  18 U.S.C. § 3142(f) (the rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the detention hearing); Fed. R. Evid. 1101(d)(3) (the rules do not apply in proceedings with respect to release on bail or otherwise).  Thus, even if Defendants argue that the recordings were not admissible and could be suppressed at trial, the Court can still consider those recordings now in the context of the detention hearing.

In addition, the Court will not grant defendants' request that they be allowed to conduct discovery in connection with the detention hearing as to how the Assistant U.S. Attorney obtained the jail recordings.  The discovery provisions of Fed. R. Cr. P. 16, do appear to apply to detention hearings since those hearings are not specifically excluded. *See e.g.*, Fed. R. Cr. P. 1(a)(5).  *See also*, United States v. Lewis, 769 F. Supp. 1189, 1193-95 (D. Kan. 1991) (in some limited instances, a magistrate judge, in the exercise of his discretion, may order pre-arraignment discovery under Rule 16; for example, where the magistrate judge is not satisfied with a proposed proffer of evidence to satisfy the burden of proof, the judge may allow discovery relevant to the issues at the detention hearing). Congress, however, did not intend that detention hearings resemble mini-trials, and a detention hearing is not a vehicle for discovery.  769 F. Supp. at 1192; United States v. Lewis, 1994 WL 579928 at * 3 (D. Kan. Sep. 29, 1994).  Here, because any discovery would relate only to whether the recordings were admissible evidence at trial,

and where the Court, in detention hearings, is not bound by the Federal Rules of Evidence, there is simply no reason for allowing the immediate discovery requested by Defendants.

## V.   CONSIDERATION OF DETENTION OR RELEASE

Having concluded that Defendants are entitled to reopen their detention hearing and that the Court is not precluded from considering the taped phone conversions with Defendants that were made by the Butler County jail,[16] the Court must now decide whether there are conditions of release which will reasonably assure that Defendant Stephen Schneider will not flee and will likewise reasonably assure the safety of any other person and the community.  If there are such conditions or combinations of conditions, Defendant should be released; if there are not, he should continue to be detained.  18 U.S.C. § 3142(e).

The Court has previously noted that there is a presumption of detention in this case under the ten-year term of incarceration imposed by the Controlled Substances Act, 21 U.S.C. § 801 *et.seq.*.  (Doc. 10 at 2.)  Defendant Stephen Schneider argues that the Court has not made the requisite finding that there is probable cause to believe that this

---

[16]  Defendants argued at the March 14 hearing that the portions of the phone conversations actually cited by the Government in its brief opposing release on bond were very short in duration and were taken out of context.  They urged the Court to listen to the recordings of the entire calls.  The Government had provided the Court with the full recordings of all of the telephone conversations from which the "clips" cited in their brief had been taken, and these recordings had also been provided to the Defendants as part of the discovery in this case.  The Court stated that it would review the full recordings in addition to the excerpts cited by the Government in its brief, and it has now done so.

Defendant has committed such an offense.  (Doc. 42 at 7.)  However, the Indictment in this case charges Defendant with such a crime and the indictment itself is a finding of probable cause.  *See* United States v. Stricklin, 932 F.2d 1353, 1355 (10th Cir. 1991). Thus, the rebuttable presumption is applicable even though Defendant Stephen Schneider characterizes it as only a "slim benefit" to the Government.

The Court has also previously identified the burden of proof that is applicable both as to the issue of flight and the issue of danger to others or the community.  (Doc. 10 at 3) (*citing* United States v. Cisneros, 328 F.3d 610, 616(10th Cir. 2003)).  Defendant agrees that the facts the judicial officer uses to support a finding that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence, while the Government's burden of proving that there is a serious risk that defendants might flee, requires a simple preponderance of the evidence.  (Doc. 42 at 7.)  *See* Cisneros, 328 F.3d at 617.

With the above standards in mind, the Court will consider both the issues of flight and danger in connection with the possible release of the Defendant.

**A.**      ***Danger to the Community.***

As Defendant notes, the Court's major concern at the time of the initial detention hearing was whether Defendant was likely to pose a danger to persons in the community by continuing to operate the Clinic and to dispense excessive amounts of controlled substances.  (Doc. 10 at 5-6.)  The Court concluded that it could not order Defendant to surrender either his medical license or his DEA registration number, and that simply

directing Defendant not to practice medicine or dispense controlled substances would be difficult to effectively monitor or enforce.  (Doc. 10 at 10-11.)  The Court was concerned that Defendant could, in effect, continue his practice and operation of the Clinic by having other medical personnel – other doctors, PA's, etc. – operate the Clinic on his behalf and under his indirect supervision or control.  (Doc. 10 at 11.)

Defendant has now had his medical license temporarily suspended by the Kansas Board of Healing Arts.  As a result, it would be unlawful for him to maintain an office for the practice of the healing arts.  (Doc. 42 at 17 n. 9, *citing* K.S.A. 65-2867.)  As a result, Defendant represents to the Court that the Clinic is totally closed.  (Doc. 42 at 17.) Defendant also argues that the Court <u>can</u> require him to voluntarily surrender his DEA registration, which he is prepared to do, and this will insure that he cannot write prescriptions while this case is pending.  (Doc. 42 at 18.)[17]  These facts do change the

---

[17]  The Government states that Defendant refused to surrender his DEA registration while he was in jail.  (Doc. 45 at 16.)  Defendant's current counsel responds by stating that he recommended that Defendant not sign the requested documents surrendering his DEA registration papers because he had not had the chance to review that paperwork. (Doc. 42 at 18 n. 10.)  It appears, however, that Defendant's actual refusal to sign the requested papers occurred on February 4, 2008 – before current counsel entered his appearance on February 7, 2008.  *See* Doc. 45 at 16.  In any event, by letter of March 4, 2008, the U.S. Department of Justice, Drug Enforcement Administration, advised counsel for Stephen Schneider that as a result of the disciplinary action taken by the State, the DEA considers Dr. Schneider to have discontinued business or ceased practice at his registered premises and accordingly his current registration is considered to be terminated.  In order to avoid this result, Dr. Schneider would be required to provide certain additional information to the DEA.  (Defendants' 3/14/2008 Hearing Exhibit A.) At the hearing, Defendant's counsel advised that Dr. Schneider would not be providing any of the requested information in an attempt to have his registration reinstated.

equation for deciding whether Defendant would be a danger to the community if he were released.

The Government argues, however, that Defendants are continuously working to keep the Clinic open through some type of lease arrangement or use of another entity, and that this indicates that Defendants intend to continue operating the Clinic as they have in the past, but now doing so indirectly through the use of other medical personnel as "proxies."  (Doc. 45 at 17-19.)  The Court's review of the recorded telephone conversations confirms that Defendants are, in fact, attempting to set up other entities, bank accounts or lease arrangements that would allow the Clinic to continue to operate and to continue paying the bank that has the mortgage on the Clinic facility.[18]  These conversations obviously give the Court some serious concerns as to how it could assure that Defendant, if released, would have no involvement, directly or indirectly, with any type of patient care or treatment and would have no control, directly or indirectly, over any other professional person who might subsequently treat Defendant's patients or operate the Clinic using another professional's medical license and DEA registration.

The Court does recognize that there is a distinct difference between Defendants

_____

[18]  *See e.g.*, Call # 2C (open under a new LLC, need new license, file Chapter 11); Call # 4E (give patients to Sack – he'll give them back – he's on Linda's payroll); Call # 16A (put Pat on as manager – basically he's [presumably Sack] just renting the Clinic – don't know how far we could push it – discussion continues using "code words"); Call # 16E (re-write lease – he'll pay bank out of his money); Call # 20B (get affidavit that Sack not reopen clinic – Sack could open his own clinic – I'm [Stephen Schneider] involved – may not get any financial benefit but make sure everyone knows what's going on – I'm out of it – have to wait until we're all done with this).

attempt to preserve the physical asset of the Clinic property (by lease or other means that would prevent its foreclosure by the bank that holds the mortgage on the property),[19] as opposed to Defendants' attempt to exercise indirect control over the future medical treatment given at the Clinic by another professional who might lease that facility.  The Court sees no danger in the former arrangement, but only so long as the latter scenario does not occur.  The Court believes that there are conditions of supervision that it can impose that will reasonably assure that Defendant does not continue to be involved – directly or indirectly – in any aspect of future treatment or care of patients or in any future dispensation of controlled substances to patients.  These conditions would also reasonably assure that Defendant would not be submitting any future billings for medical services to any private health insurer or governmental agency that might be considered to be a part of any alleged health care fraud.[20]

## B.      *Flight or Failure to Appear.*

The Court also outlined in its prior order the factors which gave it concern about

---

[19]  Defendants once jokingly suggested in a telephone call that the Clinic might be turned into a restaurant.

[20]  In opposing Defendants release, the Government also cited several threatening statements made by Linda Schneider concerning her prior appointed counsel and the Government attorney handling this case.  (Doc. 45 at 19-21.)  However, the Government identified only one instance of Stephen Schneider being involved in a telephone call where he and the other party discussed and joked about a banner hung at the Clinic by the Pain Relief Network stating, in effect, that the blood of the Clinic's patients will be on the hands of the U.S. Attorney prosecuting this case.  The Court has listened to this entire call and does not view this specific call as evidence that Stephen Schneider would pose a threat or danger to others if he were released with appropriate conditions and restrictions.

the possibility that Defendant might flee and not appear for trial and future court

proceedings.  These included a past history of regular travel to Mexico, the ownership (or

long term lease) of real property in Mexico, the existence of bank accounts in Mexico,

and the fact that Defendants had close friends or acquaintances in Mexico that could help

them.  (Doc. 10 at 6.)

Defendant's suggestion that there is no real risk of flight because Defendant does

not live close to the Mexican border (Doc. 42 at 20) is not convincing.  Likewise, the

suggestion that Defendant does not have the financial means to flee is undercut by the

identification of substantial assets belonging to Defendants that are not presently

encumbered or restrained by the Government's forfeiture claim in that they are identified

as either substitute assets or assets for which the Government is not seeking forfeiture.  In

prior pleadings, the Government identified approximately eighteen substitute or otherwise

unencumbered assets belonging to Defendants that the Government valued at

approximately $676,087.14.[21]  While Defendants have stated that they do not agree with

the Government's valuation of the substitute assets, Defendants were given the

opportunity to evaluate those assets in connection with the Government's Motion to

Revoke Appointment of Counsel, *see* Doc. 30 at 2, and they have never presented the

---

[21]  In the spreadsheet attached as Exhibit 1 to the Government's Motion to Revoke
Appointment of Counsel (Doc. 16-2, pp. 3-6), these assets were identified as Item No's 4,
14, 15–19, 21 and 30-34 and were valued separately.

Court with any alternate valuation of those assets or any assets which the Government has indicated are not subject to forfeiture at all.  In addition, the recorded telephone conversions reveal that Defendants have continued to receive checks from insurance companies and others in payment for services that were provided and billed prior to Defendants' detention and the closing of the Clinic, and that these checks have been deposited in newly-opened bank accounts.  While some of these funds have apparently been used to pay the mortgage payments on the Clinic mortgage, presumably some of those funds are still available to Defendants.

The Government also cited other evidence that they believe supports the conclusion that Defendant Stephen Schneider intends to flee if released.  (Doc. 45 at 13.) This involved a letter Stephen Schneider sent to Linda Schneider while they were in the Butler County jail which had, on the front of the envelope, a colored drawing of the cartoon character Tweety Bird and the words "Be on the beach in no time!!" (Defendants' 3/14/2008 Hearing Exhibit C.)  Defendant's counsel proffered that the drawing and written statement on the envelope were done by another inmate with artistic talent and were done as a favor to Defendant.  Defendant offered two other envelopes as exhibits with similar drawings to demonstrate the circumstances surrounding the drawings and writings.  (Defendants' 3/14/2008 Hearing Exhibits B and D.)   It is noteworthy that Defendant Stephen Schneider gave this same explanation about the envelopes in one of his recorded telephone calls.  *See* Call # 14A.  The Court does not view this single event

as compelling evidence that this Defendant will likely flee if released on conditions.[22]

While the Court remains concerned about Defendant's ties to Mexico, it does appear that there are conditions of release that can be imposed that will reasonably assure that Defendant Stephen Schneider does not flee and will appear for future court proceedings.

---

[22]   All of the other examples of evidence that would imply flight were made by Defendant Linda Schneider and are not attributable to Defendant Stephen Schneider.  *See* Doc. 45 at 12-13.

C.      *Conditions of Release.*

Defendant initially urges that he should be released on his own personal recognizance or upon the execution of an unsecured appearance bond in an amount specified by the court in accordance with 18 U.S.C. § 3142(b).  (Doc. 42 at 2.)  For the reasons stated in the initial Order of Detention (Doc. 10), as supplemented by the above discussion in this Memorandum and Order, the Court finds that release of Defendant on his own recognizance and upon execution of an unsecured appearance bond alone will not reasonably assure either the safety of the community or the appearance of the Defendant. Therefore, the Court will consider Defendant's alternative request that he be released pursuant conditions or a combination of conditions as provided by 18 U.S.C. § 3142(c).

While the Government now opposes this Defendant's release, it initially proposed special conditions which it believed should be imposed if Defendant Stephen Schneider were to be released instead of detained.  (Doc. 1.)  These included: (1)  a restriction on his travel by allowing him to travel only in the State of Kansas; (2)  requiring any travel outside of the Wichita, Kansas area to be pre-approved by Probation and Pretrial Officer; (3) requiring that Defendant surrender his passport; (4) requiring that Defendant be placed on electronic monitoring (or GPS monitoring); and requiring Defendant to either execute an agreement to forfeit real and personal property or post a significant bond.[23]

---

[23]  *See e.g.*, 18 U.S.C. § 3142(c)(1)(B), subsections vii (curfew with electronic monitoring), iv (travel restrictions), xiii (return to custody for specified hours), xi (agreements to forfeit property), and xii (bail bonds).  These are all standard conditions often imposed by courts.  The additional request that Defendants liquidate any assets in

In his motion for bond, as an alternative position, Defendant Stephen Schneider agrees that the following conditions of release would be appropriate: (1) electronic monitoring; (2) reporting on a regular basis to pre-trial services officers; (3) surrender of his passport pending completion of the case; (4) travel restricted to the State of Kansas and to the Greater Kansas City area where his counsel has an office; (5) any other travel to be pre-approved by the United States Probation Office; (6) a prohibition against entering the premises of the Schneider Medical Clinic without his defense counsel being present; (7) a requirement that he not participate, directly, or in any fashion or involve himself in the business of operating any medical facility, clinic or other business by which healthcare services are rendered to patients; and (8) any other conditions, limitations or restrictions imposed by the Court.  (Doc. 42 at 8-9.)

After considering the arguments of both parties, the Court finds that Defendant Stephen Schneider should be released on the following combination of conditions and finds that the imposition of these conditions will reasonably assure the safety of the community and the appearance of the Defendant for further court proceedings:

1.    Defendant shall execute an Agreement to Forfeit, upon failing to appear as required, all of the property identified on Exhibit 1 to the Government's Motion to Revoke Appointment of Counsel (Doc. 16-2, pp. 3-6) as Item No's 1-3, 5-13, 20 and 22-24.  The agreement shall be in substantially the

Mexico and repatriate the funds into the custody of the U.S. Marshal, was not supported by citation of any legal authority and was rejected by the Court.  (Doc. 10 at 7-8.)

same form as AO 100 (Rev. 11/07) (Agreement to Forfeit Property).  In the event Defendant fails to appear as required, and upon a finding of the Court of such failure to appear, Defendant further stipulates that the Agreement to Forfeit Property may be enforced not only in this pending criminal case but also in the pending civil forfeiture case, No. 07-1119-MLB.[24]  18 U.S.C. § 3142(c)(1)(B)(xi).

2.     Defendant shall execute an Appearance <u>and Compliance</u> Bond on AO Form 98A (Rev. 11/07) (Appearance and Compliance Bond) in the amount of $325,000.[25]  No sureties or deposit of monies with the Clerk will be required in connection with the bond.  18 U.S.C. § 3142(c)(1)(B)(xii).

3.     Defendant shall be required to report to Pretrial Services as directed, and follow all instructions of the supervising officer.  18 U.S.C. § 3142(c)(1)(B)(vi).

4.     Defendant shall be required to surrender his passport to the Clerk of the Court, and agree not to obtain any other passport.

5.     Defendant shall abide by the following restrictions of place of abode or travel: Defendant shall not travel outside of Sedgwick County, Kansas, without prior written permission of the supervising Pretrial Officer; Defendant may, with prior written permission from the Pretrial Officer, travel to the Greater Kansas City Kansas/Missouri area for purposes of meeting and conferring with counsel.  18 U.S.C. § 3142(c)(1)(B)(iv).

6.      Defendant shall avoid all contact, direct or indirect, with any persons who are victims of Defendant's alleged criminal conduct and any family

---

[24]  Defendant has argued that he will not flee because if he does, he will lose all the assets that have been seized.  (Doc. 42 at 3.)  This condition merely formalizes that understanding, and covers only the specific assets for which the Government is seeking forfeiture (not counting substitute assets).  According to the Government, these assets are valued at approximately $3,829,000, without consideration of any liens or mortgages on the properties.  (Doc. 16-2, pp. 3-6.)

[25]  This amount is approximately one-half of the amount of substitute assets and unencumbered assets identified by the Government on Exhibit 1 to the Government's Motion to Revoke Appointment of Counsel (Doc. 16-2, pp. 3-6) as Item No's 4, 14, 15–19, 21 and 30-34.

members of such persons.[26]  18 U.S.C. § 3142(c)(1)(B)(v).

7.      Defendant shall refrain from any possession of a narcotic drug or other controlled substances defined in 21 U.S.C. § 802, unless prescribed for his specific use by a licensed medical practitioner.  18 U.S.C. § 3142(c)(1)(B)(ix).

8.      Defendant shall participate and abide by all the requirements of a program of home detention which restricts Defendant to his residence at all times except for employment, education, religious services, medical, substance abuse, or mental health treatment, attorney visits, court appearances, court-ordered obligations or other activities as may be pre-approved by the pretrial services office or supervising officer.  18 U.S.C. § 3142(c)(1)(B)(vii) & (xiii).

9.      Defendant shall, in connection with the home detention required in paragraph 8 above, be subject to electronic monitoring or other location verification system such as a global positioning satellite.  Defendant shall pay all costs of this monitoring to the extent that his financial condition permits.  18 U.S.C. § 3142(c)(1)(B)(xiv).[27]

10.     Defendant is prohibited from entering the premises of the Schneider Medical Clinic without his defense counsel being present.  18 U.S.C. § 3142(c)(1)(B)(xiv).

11.     Defendant is prohibited from participating, directly, indirectly or in any fashion, in any medical consultation, recommendation or treatment of any

---

[26]  The Court recognizes that there have been allegations that both Defendants and the Government have contacted some of Defendant's patients in the course of this case. This provision shall not prohibit Defendant from having contact with any patient who is not a victim of Defendant's conduct and who does not object to contact from the Defendant, provided however, that any such contact shall not violate the other restrictions in this Memorandum and Order that prohibit Defendant from engaging, directly or indirectly, in any type of medical treatment or care of any patients or the dispensation, directly or indirectly, of any controlled substances to such patients.

[27]  18 U.S.C. § 3142(c)(1)(B)(xiv) authorizes the court to impose "any other condition that is reasonably necessary to assure the appearance of the person as required and to assure the safety of any other person and the community."

person, and is further prohibited from engaging, directly or indirectly, in the business of operating any medical facility, clinic or other healthcare related business by which healthcare services are rendered to patients; provided however, that this provision shall not prohibit Defendant from renting or leasing the physical premises of the Schneider Medical Clinic to another licensed medical practitioner so long as Defendant has no direct or indirect role in the operation of the facility or medical treatment or consultation concerning any patients who are treated at the Clinic.  18 U.S.C. § 3142(c)(1)(B)(xiv).

12.     Defendant shall provide to Pretrial Services copies of any documents related to any agreement by Defendant to lease, rent, or otherwise allow other persons or entities to use the physical facility know as the Schneider Medical Clinic, and shall further provide any and all continuing information concerning any such arrangement at such times as Pretrial Services may request.  Defendant shall insert in any future lease or agreement a provision which authorizes Pretrial Services to enter and inspect the Clinic premises for the purpose of determining compliance with these conditions of release or shall otherwise obtain from any person using the Clinic, now or in the future, a written consent and approval for such inspections.  18 U.S.C. § 3142(c)(1)(B)(xiv).

13.     Defendant shall be financially responsible for the preservation of the medical records of all patients previously treated at the Schneider Medical Clinic and shall designate and compensate a custodian for such medical records in accordance with a prior order of the Court.  (Doc. 26.)[28]  18

---

[28]  Defendants have argued during recent hearings that they do not have the financial ability to compensate a custodian of the records now that Timothy MacDonald has refused to continue in that capacity.  As previously noted in this Memorandum and Order, Defendants have failed to provide the Court with any information about their valuation of the substitute assets identified by the Government which are not subject to restraint by the Government.  *See* Exhibit 1 to the Government's Motion to Revoke Appointment of Counsel (Doc. 16-2, pp. 3-6).  Nor have they provided any information about other assets of Defendants identified by the Government for which the Government is not seeking forfeiture.  *Id.*  Nor have Defendants provided the Court with any information about continuing payments received by them for prior services.  While the Court is not to impose a financial condition of release that results in the pretrial detention of a defendant, 18 U.S.C. § 3142(c)(2), Defendant has not come forward with any evidence to establish his financial inability to provide preservation of these records as he

U.S.C. § 3142(c)(1)(B)(xiv).

14.   Defendant shall notify the Court and the Attorney for the United States within forty-eight hours of any agency or court decision or action which has the legal effect of reinstating Defendant's license to practice medicine in the State of Kansas.[29]  18 U.S.C. § 3142(c)(1)(B)(xiv).

15.   Defendant shall surrender his DEA registration and shall not take any action required by the DEA as outlined in the letter of March 4, 2008 (Defendants' 3/14/2008 Hearing Exhibit A) in order to reinstate his DEA registration.  18 U.S.C. § 3142(c)(1)(B)(xiv).

## VI.  CONCLUSION

For the above reasons, the Court allows the reopening of the detention hearing and finds that Defendant Stephen Schneider should be released from pretrial custody with the conditions and combination of conditions set out in this Memorandum and Order.  A hearing to execute the Agreement to Forfeit Property and Appearance and Compliance Bond in the form attached to this Memorandum and Order, and to sign the Conditions of Release, is set for **Thursday, April 24, 2008 at 2:00 p.m.** in Courtroom 406, U.S. Courthouse, 401 North Market, Wichita, Kansas, before the undersigned magistrate

---

is legally obligated to do.

[29]  Because the temporary suspension of Defendant's medical license has resulted in the closing of the Clinic, and because this is the fact which convinced the Court to reopen the issue of detention of Defendant, any change in the status of Defendant's medical license that would allow him to again treat patients or reopen the Clinic will be considered by the Court as new information that will allow the Court to again reopen the issue of detention.  At the March 14, 2008 hearing, Defendant's counsel agreed with this approach, arguing that if the Clinic were ever reopened, the Court could reopen the detention issue.

judge, <u>unless</u> either party, during the stay of this release order as provided in paragraph E, *infra*, has sought review of the order from the assigned district judge.

The Court therefore enters the following Orders on the matters pending before it:

A.    The Government's Motion for Reimbursement of Attorneys Fees (Doc. 16) is hereby GRANTED, and Defendant Stephen J. Schneider shall pay into the registry of the Court for deposit in the Treasury, the sum of $3,585.45 to reimburse the Government for the cost of prior appointed counsel and investigative costs, and Defendant Linda K. Schneider, a/k/a Linda K. Atterbury, shall pay into the registry of the Court for deposit in the Treasury, the sum of $2,377.24 to reimburse the Government for the cost of prior appointed counsel, and these payments shall be made on or before **June 20, 2008**;

B.    Defendants' Supplemental Motion (Doc. 44) for an Order concerning future treatment of substitute assets identified by the Government is DENIED;

C.    The Government's Motion to Supplement the Record (Doc. 46) is hereby GRANTED, and the CD identified as an exhibit to the motion shall be filed conventionally with the Clerk of the U.S. District Court;

D.    Defendant Stephen Schneider's Motion for Release on Own Recognizance or to Set Bond (Doc. 41) is GRANTED IN PART and DENIED IN PART as specifically set out in this Memorandum and Order, and Defendant Stephen Schneider shall be released upon execution of the Agreement to

36

Forfeit Property and Appearance and Compliance Bond in the form attached to this Memorandum and Order, and execution of the Conditions of Release, at the April 24, 2008 hearing;

E.      The portion of this Memorandum and Order allowing the release of Defendant Stephen Schneider is hereby STAYED until **Wednesday, April 23, 2008 at 4:30 p.m.** to allow any party the opportunity to seek review of this Order pursuant to the provisions of 18 U.S.C. § 3145;

F.      Ruling on Defendant Linda K. Schneider, a/k/a Linda K. Atterbury's, Motion to Set Bond and Conditions of Release (Doc. 39) is taken under advisement at the direction of the District Judge pending completion of her psychological examination or further order of the Court.

IT IS SO ORDERED.

Dated at Wichita, Kansas, this 21ST day of April, 2008.

　s/   DONALD W. BOSTWICK
DONALD W. BOSTWICK
United States Magistrate Judge