# UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No.   07-10234-02-MLB** |
| ) | |
| **LINDA K. SCHNEIDER, a/k/a,** ) | |
| **LINDA K. ATTERBURY,** ) | |
| **d/b/a SCHNEIDER MEDICAL** ) | |
| **CLINIC** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

## MEMORANDUM AND ORDER

Presently before the undersigned magistrate judge is the following motion:

> Defendant Linda K. Schneider's Request for Reconsideration of the
> Cash Requirements for Release Under the Bail Reform Act filed
> February 4, 2009 (Doc. 321).

Upon receipt of this motion, the court contacted counsel for the parties and set this

matter for a hearing on February 5, 2009 at 3:30 p.m.

## I.    BACKGROUND

A detailed history of the numerous proceedings concerning Linda K.

Schneider's detention or release was set out in the court's Memorandum and Order

of February 2, 2009 (Doc. 317.)  In that Memorandum and Order, the court

allowed Linda Schneider's release subject to her execution of an Agreement to

Forfeit Property, an Appearance and Compliance Bond and several written

conditions of release.  (Doc. 317 at 14-19.)  The Appearance and Compliance Bond

was in the face amount of $325,000 and required a cash deposit of $100,000.  No

specific objection was made at the hearing that this bond amount was excessive or

that Defendant could not post the required cash amount.  Immediately after the

February 2 hearing, defense counsel apparently met with the press about the

hearing, and the Wichita Eagle reported the following:

> Defense lawyer Eugene Gorokhov said she [Linda
> Schneider] could be released late this week.

The Wichita Eagle, Tues, Feb. 3, 2009, Section 1B at pages 1B, 3B.  Also,

immediate steps were taken by the family to install another telephone line for the

GPS system for Linda Schneider.  All in all, actions by Defendant's attorneys and

family certainly indicated that they were prepared to post the required cash deposit.


    The present motion by Defendant, however, tells a different story.  In the

motion, Defendant's counsel now states that:

> In the two days since the oral ruling, defendant's counsel
> has researched resources which may be available to post
> the required $100,000 in US currency.  It is now apparent
> that defendant and her spouse co-defendant simply do not
> have the financial wherewithal to deposit $100,000 with

> the Clerk.  Moreover, bail bondsmen in the area are
> unable to underwrite such a large cash bond.

(Doc. 321 at 1.)   Accordingly, Defendant asked the court to reconsider the amount

of the cash deposit pursuant to 18 U.S.C. § 3142(c)(3), and asked for an expedited

hearing on the motion.  The court did expedite the hearing of this matter and is

now prepared to rule on the motion.

## II.   DEFENDANT'S ABILITY TO POST THE REQUIRED CASH

Defendant's financial condition has been addressed in earlier proceedings in

this case.  At the beginning of this case, Defendant and her husband both requested

appointed counsel.  Subsequently, the Government contested their right to

appointed counsel.  The Government identified specific assets of the defendants

that were designated as either "substitute" assets for forfeiture purposes or which

were not subject to any forfeiture claims, and placed values on those assets.  That

property is identified on Exhibit 1 to the Government's Motion to Revoke

Appointment of Counsel (Doc. 16-2, pp. 3-6) as Item No's 4, 14-19, 21, 25-26 and

28-34.  The Government represented that the value of that unencumbered property

was approximately $690,000.  (Doc. 16 at 6-9.)  The court required both

Defendants to provide the court with all financial records that would support their

right to appointed counsel.  Both of the then court-appointed counsel then filed an

ex parte motion with the court requesting permission to retain a C.P.A. to assist

counsel in providing the required financial information to the court.  (Doc. 21)

(Sealed.)   However, rather than providing this information, Defendants retained

counsel on their own, *see* Doc. 30, and they ultimately were ordered to reimburse

the Government for the costs of their appointed counsel.  (Doc. 70 at 6.)

Therefore, Defendants never supported their allegations that the value of the

substitute assets and other unencumbered assets were not worth what the

Government claimed.

Likewise, at the February 2, 2009 hearing on Linda Schneider's renewed

motion for pretrial release, while counsel for Linda Schneider stated that any

financial resources Defendant might have had six months ago had been depleted by

the costs of defending this case, Defendant presented no <u>evidence</u> that any such

assets had been depleted, or to what degree.

In the Memorandum and Order of February 2, 2009, the court specifically

discussed what would be required if Linda Schneider were to subsequently claim

that she was unable to post the cash required as collateral for the Appearance and

Compliance Bond:

> Finally, the court acknowledges that under the Bail
> Reform Act, 18 U.S.C. § 3142(c)(2), "[t]he judicial
> officer may not impose a financial condition that results
> in the pretrial detention of the person."  Defendant
> argued at the hearing on the present motions that the
> financial resources which Defendant may have had six

months ago have now been depleted by the costs of
defending this criminal case.  If Defendant seeks to
revisit the conditions of her release in the future, she
must present to the court full and complete financial
records to justify any argument that she cannot afford the
cash deposit imposed by the court. [footnote omitted].

(Doc. 317 at 17.)

The court has not found any specific guiding precedent in the Tenth Circuit

concerning the extent of evidence that a defendant must present concerning

inability to meet a stated bond amount, but one other circuit court noted a concern

where defendant "presented no further affidavit, nothing to supplement his bare

say-so that he cannot post the bail, a say-so that the district judge found

insufficient."  U.S. v. Szott, 768 F.2d 159, 160 (7th Cir. 1985).  That court then

outlined the procedure to be followed:

If, after making diligent efforts to post the $1 million,
Szott cannot do so, he is free to describe these efforts to
the magistrate.  Then the magistrate may make factual
findings about Szott's ability (or inability) to post the
bail, and this will set the stage -- if this becomes
necessary -- for a review of the decision denying release
under § 3142(e).

768 F.2d at 160.  In accord with its prior admonition, the court will require Linda

Schneider to present evidence, either documentary or testimonial, to support her

counsel's assertion that she cannot meet the $100,000 cash deposit required by the

Memorandum and Order of February 2, 2009.

At the February 5 hearing, Defendant's counsel proceeded by offering Defendant's Exhibit 1, a four page listing of Linda Atterbury and Stephen Schneider's Assets and Debts.  It was represented that this had been prepared by Defendant Stephen Schneider.[1]  (A redacted version of the exhibit had been provided to the Government which redacted certain information about the payment of attorneys fees and investigation expenses).

The Government then presented Government's Exhibit A which was a two page summary of assets previously identified as "substitute assets" or unencumbered assets in the Government's prior motion to revoke appointment of counsel (Doc. 16), followed by various exhibits (previously filed in connection with Doc. 16) supporting the summary sheets.

The Court then spent a considerable amount of time having counsel correlate the specific assets listed on Defendant's Exhibit 1 with the assets listed on Government's Exhibit A.  After that review, and after giving counsel the opportunity to comment on both exhibits, both exhibits were admitted into

---

[1]  In fact, Stephen Schneider's counsel, Lawrence Williamson, was present at the hearing.  He was allowed by the court to explain that he had worked with Stephen Schneider, both recently and continuously since Dr. Schneider was released from custody, to compile the information on Defendant's Exhibit 1.  Mr. Williamson stated that Stephen Schneider could present an affidavit as to his preparation of this exhibit if necessary.  The court was advised that Stephen Schneider was not at the hearing because he was home waiting for installation of the second land line necessary for Linda Schneider's GPS system.

evidence without objection of any counsel.  These exhibits are both being filed

under seal because they contain personal financial information.  The court has

prepared an Appendix which compares the assets shown on both exhibits along

with the values placed on those assets by both parties (along with comments

relevant to the assets).  That Appendix is an attachment to this Memorandum and

Order but is also being filed under seal for the same reason.

The court notes that many of the Government's values are somewhat dated,

with many of the values reflected as of dates in 2006-2007 (and some dates even

older).  However, the Government's exhibit does contain some backup

information, including documents to support many of the values assigned to the

assets shown in the summary.

Defendant's Exhibit 1 is somewhat confusing in its overall format. [2]

Defendant's totals for assets and debt would appear to result in the following

"balance sheet": Total Assets of $2,294,114 (of which $1,901,537 are allegedly in

the Government's possession due to seizure in this case), and total debts of

$2,058,402, for a net worth of $235,712.  As to assets alone, if one were to take

---

[2] For example, Defendant lists Federal Income Taxes for 2006 and 2007 as debts, but states that the amount(s) shown "has been sent to the tax lawyers for settlement."  If the money has been sent for payment, then these should not be included as outstanding debts since they have been paid.

Defendant's represented American assets, deduct the value of those assets in

possession of the USA, and then add the Mexican assets, the result is assets of

$392,577.  Defendant then states, however, that the total available assets for

liquidation are only $62,809.82.  While it is difficult to ascertain from the exhibit

how that number is calculated, it is approximately the total of the Mexican bank

account, two boats, a Mustang and the Mid American Credit Union account which

the court totals as $60,694.  *See e.g.,* Appendix Items 1, 3, 4, 8, 9, 12 & 18.[3]  At the

hearing, however, Defendant's counsel mentioned a figure of $60,000 as an

amount that might result in readily available cash, and included the E*Trade

Account, the Mid American Credit Union account, the Intrust account and sale of

the 1966 Corvette, but thought it was overly optimistic to believe that the Corvette

could be sold for the listed value in a short period of time.  This would total

approximately $60,000.

In arguing that she cannot come up with the required cash deposit,

Defendant apparently gives no consideration at all to any value of the Mexican

---

[3] Defendant has attempted to identify assets that have been cashed in to pay legal fees over the last year in their exhibit, and it appears that an Allianz Life Annuity, a Jackson National Life Insurance policy, and a Midland National Annuity have all been depleted.  *See* Defendant's Exhibit 1 at 1.  *See also* Appendix, Items 2, 19 & 20.  Likewise, it appears that the Mid American Credit Union account has been substantially depleted from the 2007 balance shown by the Government to the value shown by Defendant on its exhibit.  *See* Appendix, Item 18.

Villa in Acapulco which Defendant lists on Defendant's Exhibit 1 at a value of $150,000.  Defendant argues that it is only a leasehold interest, that it is uncertain whether that could be sold or mortgaged, that it is difficult to ascertain accurate information since Defendant's counsel doesn't speak Spanish or know Mexican law.[4]  Defendant's counsel also represented at the February 5 hearing that Defendant actually has no knowledge about the present condition of the property and that for all she knows, the building has not been maintained and may not be standing.

On the other hand, the Government points out that on <u>April 29, 2004</u>, both Defendants signed a financial statement to a commercial bank where they listed property in Acapulco, Mexico with an assessed value of $300,000, and a cash value of $250,000.  *See* Government's Exhibit A, attached Ex. 5 at 2.[5]  On <u>May 12, 2004</u>, a wire transfer of $130,000 was sent by Defendants from a Kansas bank

---

[4]  The court recalls that defense counsel proffered these same excuses about lack of knowledge of Mexican law and value of the Mexican property to the court in earlier hearings in April 2008 in connection with Defendants' earlier motions seeking release on bond.  Apparently Defendants' counsel has done nothing to investigate the value or condition of this asset in the intervening ten months.

[5]  In fact, exhibits filed by the Government when contesting the issue of Defendants' right to appointed counsel contained an even earlier financial statement of September 18, 2003, by Linda Atterbury Schneider to a commercial bank where the Mexican property was also shown at an assessed value of $300,000 and a cash value of $250,000.   See Doc. 33 at 9.

to the Mexican bank, , Bancomer Bank, Alcapulco [sic], Mexico. See

Government's Exhibit A, attached Ex. 7.  Then, on <u>May 23, 2005</u>, both defendants

signed another financial statement to a commercial bank where they identified

"MX House" at an assessed value of $200,000 with no mortgage.  *See*

Government's Exhibit A, attached Ex. 4 at 2.

When questioned about the Mexican bank account, which the Government

valued at $130,000, and Defendant valued at $6,000, Defendant's counsel stated

that the difference of $124,000 had been used to acquire an additional leasehold

interest in property adjacent to the Mexican Villa.  Then, when asked if

Defendant's valuation of the Mexican Villa at $150,000 on Defendant's Exhibit 1

was before or after this additional property had been acquired, counsel indicated

that he believed that it was the value <u>after</u> the acquisition of additional adjacent

property.  This whole explanation is very troubling to the court because Defendants

valued the Mexican property at $250,000 cash in the month <u>before</u> the money was

wire transferred to Mexico, thereby giving the very strong impression that the

additional acquisition of property for $124,000 would have significantly increased

this previous $250,000 valuation.  Defendant has presented no valid explanation

for totally disregarding the value of the Mexican property.

The court is also very skeptical about Defendant's cavalier disregard of the

Mexican property for other reasons.  The Government has argued that the

Indictment Case No. 06-10106-MLB alleges that it was an Eric Taylor for whom

Linda Schneider obtained false documents that resulted in her earlier guilty plea in

that case.  The Government has also alleged that Linda Schneider continues to

"harbor" Eric Taylor who is a fugitive and who is apparently now living in

Mexico.  Apparently, Taylor was originally going to operate the Mexican Villa as a

tourist attraction for Americans.  *See* Doc. 33 at 31-32.  Defendant's counsel

argued that these plans for the Mexican Villa were made back in 2006, and he

implied, but did not specifically state, that Taylor may no longer be living at, or

caring for, this property.  However, based on Linda Schneider's prior connection

with Eric Taylor and her interest in the Mexican property, the court finds it

impossible to believe that she does not know much more about that property,

including its use, condition and value, than is now represented to the court.  She

certainly knows that other assets have been sent to Mexico (boats and vehicles) and

are either still located there or were sold in Mexico.  *See* Appendix, Items 1, 3, 4

and 17.  Finally, Linda Schneider has indicated in telephone calls in 2008 that

when she's released, she wants to take Sioban Reynolds to Mexico for the time of

her life.  *See* Doc. 164 at 19-20.  This would strongly indicate that Linda Schneider

is very aware of the situation involving the Mexican Villa.

11

The court also notes that in the February 2 hearing, there was argument about the Government's prior statements that there might be conditions the parties could agree to that would allow Linda Schneider's release.  See Doc. 210.  The Government proffered that several things were demanded by the Government in their negotiations, including *inter alia*, the sale of the Mexican property or placing it in some type of trust with an independent third party, and the repatriation of the money held in the Mexican bank account.  Defendant apparently refused to consider anything that related to the Mexican property.  This causes the court to conclude that the Mexican property either has more value than is being represented to the court, or that it is being retained for use by Eric Taylor, or that it is being retained as a place to flee by Defendant if she were released from custody.

The Government also argued about the Oklahoma property, noting that in two financial statements to commercial banks in 2004 and 2005, both defendants listed the Oklahoma house (or the Grand Lake, Oklahoma house) as an asset, valuing it at either an assessed value of $250,000 or a cash value of $200,000.  *See* Government's Exhibit A, attached Ex's 4 & 5.  Again, while Defendant lists the value of the Oklahoma property as $180,000, Defendant gives no consideration to the Oklahoma property, arguing that Linda Schneider's father has a lien on the property that probably exceeds its value.  During the February 5 hearing, the court

12

asked if there was a mortgage filed on the property and counsel for Stephen

Schneider stated that he thought there was, but he did not know the amount of the

mortgage.  No copy of any mortgage document has been produced.  Linda

Schneider's counsel also stated at the February 5 hearing that it was "possible" that

the Government might have priority over any other lien on that property, but

notwithstanding this possibility, no value was assigned to that property for

purposes of obtaining funds to post as collateral for the bond.[6]  The court agrees

with Defendant that the Oklahoma property should <u>not</u> be considered as a source of

funds for collateral here because it is currently the subject of a civil forfeiture

---

[6] The Government also notes that while Defendant states that the Haysville property (224 W. 79th) has always been owned by Linda Schneider's father, Lee Atterbury, both defendants represented it as one of their jointly owned assets in a 2004 financial statement to a commercial bank.  Government's Exhibit A, attached Ex. 5 at 2 ("224 W 79th S. KS" listing an assessed value of $400,000 and a cash value of $300,000).  Linda Schneider also listed that property as an asset on a financial statement she gave to a commercial bank on September 18, 2003.  *See* Doc. 33 at 8-9 (indicating that it was jointly owned property purchased 20 years ago with no mortgage).  Defendant's counsel at the February 5 hearing argued that any prior representations on financial statements were not relevant to the issues before the court and, at best would only be indications of possible bank fraud.  <u>However, these type of representations clearly reflect on the credibility of the Defendants when considering the assets they now list and value, particularly where that listing and valuation contains no backup documentation such as mortgages, etc.</u>  As to the Haysville property itself, however, the court does agree with Defendant that it should <u>not</u> be considered a source of funds for posting collateral for a release bond since that property is the subject of the Government's civil forfeiture action (*see* Case No. 07-1119-MLB, Doc. 12), and because it is already the subject of the Agreement to Forfeit Property signed by both Defendants.  (The Haysville property is Item 2 listed in Government's Motion to Revoke Appointment of Counsel and as such is specifically covered by the Agreement to Forfeit Property, Doc. 81.)  Whatever rights the Government may have to that property will be resolved in the civil forfeiture action.

action by the Government (*see* Case No. 07-1119-MLB, Doc. 12), and because it is already the subject of the Agreement to Forfeit Property signed by both Defendants.  (The Oklahoma property is Item 3 listed in Government's Motion to Revoke Appointment of Counsel and as such is specifically covered by the Agreement to Forfeit Property, Doc. 81.)  Whatever rights the Government may have to that property will be resolved in the civil forfeiture action.

In conclusion, while it is clear that defendants' financial condition has deteriorated significantly over the past eighteen months or so, the court does not believe that Defendant has adequately shown that she is unable to meet the cash obligation required by the court.[7]  Instead, it appears to the court that Defendant is seeking to protect certain specific property, *i.e.,* the Mexican Villa, by effectively refusing to consider it as a possible source of funds to post as collateral for the bond.  The court realizes that this hearing was set on short notice at Defendant's request and that Defendant's family and counsel have not had much time to

---

[7] Counting even Defendant's currently reduced valuation of the Mexican Villa at $150,000, together with the other assets identified on Defendant's Exhibit 1, would indicate that Defendant may have unencumbered assets worth over $200,000 (*see* Appendix, Items 1, 3, 4, 6, 8, 9, 12, and 18), which does not include any values for other items which Defendant either did not list on its exhibit (see Appendix, Items 10, 11, 13, & 15) or items titled in Eric Taylor's name (see Appendix, Item 16).  Moreover, considering the $124,000 additional investment by Defendant in property adjacent to the Mexican Villa, and the prior valuations placed on the property by Defendant in prior financial statements, there is a strong indication that the value of that property may well be much greater than the $150,000 represented by Defendant.

liquidate assets or arrange for mortgages, etc.  However, Defendant has been

seeking her release for over ten months and should have anticipated that these type

of questions could arise.  Moreover, since it appears that Defendant has a tax

accountant or tax lawyers handling federal income tax matters and settlements, *see*

Defendant's Exhibit 1 at 2-3, the court cannot understand why more detailed

records could not have been presented concerning Defendants' assets.

## III.    REDUCTION OF THE BOND UNDER 18 U.S.C. 3142(c)(3)

Even assuming, *arguendo*, that Linda Schneider had established an inability

to meet the $100,000 cash deposit, this does not automatically entitle her to a

reduction in the cash amount to be deposited.  The provision of 18 U.S.C. §

3142(c)(2) which states that  "[t]he judicial officer may not impose a financial

condition that results in the pretrial detention of the person," does not require that

anyone who cannot financially meet a bond requirement must automatically be

released.  The Court has not found any guiding precedent in the Tenth Circuit

concerning application or interpretation of 18 U.S.C. § 3142(c)(2).  Other circuits,

however, have considered this language and its meaning.  *See* U.S. v. Jessup, 757

F.2d 378, 388-89 (1st Cir.1985) *abrogated on other grounds by* U.S. v. O'Brien,

895 F.2d 810 (1st Cir.1990);  U.S. v. Szott, 768 F.2d 159, 160 (7th Cir. 1985);  U.S.

v. McConnell, 842 F.2d 105-108-09 (5th Cir.1988); U.S. v. Fidler, 419 F.3d 1026,

1028 (9th Cir.2005).  Likewise, several lower courts have cited and applied these

circuit cases in considering this provision of the Bail Reform Act:

> If the defendant is found to be a flight risk or a danger to
> the community, the defendant may be released subject to
> conditions. Section 3142(c) specifically prohibits the
> court from "impos[ing] a financial condition that results
> in the pretrial detention of the [defendant]. Section
> 3142(c)(2). In *United States v. Fiedler,* 419 F.3d 1026,
> 1028 (9th Cir.2005), the Court of Appeals explained that
> "[t]his provision was intended to prevent the practice of
> 'de facto preventative detention,' where a judge could in
> effect issue a detention order without a proper finding of
> risk of flight or danger to the community by granting bail
> but setting an exorbitant financial condition that the
> defendant could not meet." However, the Court of
> Appeals explained that "the de facto detention of a
> defendant under these circumstances does not violate §
> 3142(c)(2) if the record shows that the detention is not
> based solely on the defendant's inability to meet the
> financial condition, but rather on the district court's
> determination that the amount of the bond is necessary to
> reasonably assure the defendant's attendance at trial or
> the safety of the community. This is because, under those
> circumstances, the defendant's detention is 'not because
> he cannot raise the money, but because without the
> money, the risk of flight [or danger to others] is too
> great." *Id.* quoting *United States v. Jessup,* 757 F.2d 378,
> 389 (1st Cir.1985) *abrogated on other grounds by United
> States v. O'Brien,* 895 F.2d 810 (1st Cir.1990).

U.S. v. Gallegos 2008 WL 2705162 at *2  (S.D.Cal.,2008).  *See also* U.S. v.

LeClercq 2007WL 4365601, *2, *4 (S.D.Fla.,2007);  U.S. v. Montoya 486

F.Supp.2d 996, 999 (D.Ariz.,2007).

Likewise, the establishment of a bond amount does not require the court to

set the bond at an amount that is easily met by a defendant.

> Section 3142(c)(2) of Title 18 provides that "[t]he judicial officer may not impose a financial condition that results in the pretrial detention of the person." It has been recognized, however, that the setting of financial conditions which the defendant cannot meet does not always contravene the statute. *United States v. Wong-Alvarez,* 779 F.2d 583, 584(11th Cir.1985); *accord United States v. Fidler,* 419 F.3d 1026, 1028 (9th Cir.2005); *United States v. Mantecon-Zayas,* 949 F.2d 548, 550 (1st Cir.1991); *United States v. McConnell,* 842 F.2d 105-108-09 (5th Cir.1988); *Westbrook,* 780 F.2d at 1188-89; *United States v. Jessup,* 757 F.2d 378, 388-89 (1st Cir.1985), *abrogated on other grounds by United States v. O'Brien,* 895 F.2d 810 (1st Cir.1990). The *de facto* detention of a defendant under these circumstances does not violate § 3142(c)(2) "if the record shows that the detention is not based solely on the defendant's inability to meet the financial condition, but rather on the district court's determination that the amount of the bond is necessary to reasonably assure the defendant's attendance at trial or the safety of the community." *Fidler,* 419 F.3d at 1028. This is because under such circumstances, the defendant's detention is "not because he cannot raise the money, but because without the money, the risk of flight is too great." *Jessup,* 757 F.2d at 389. Thus, "the statute does not require that a defendant be able to post the bail 'readily' ". *United States v. Szott,* 768 F.2d 159, 160 (7th Cir.1985). "The purpose of bail is not served unless losing the sum would be a deeply felt hurt to the defendant and his family; the hurt must be so severe that defendant will return for trial rather than flee. This implies that a court must be able to induce a defendant to go to great lengths to raise the funds without violating the condition in § 3142(c) that bail may not be

17

used to deny release altogether." *Id.*

U.S. v. LeClercq, 2007WL 4365601, *2(S.D.Fla.,2007).

In this case, Linda Schneider has already had multiple detention hearings. Both the undersigned magistrate judge and the assigned trial judge, after a *de novo* review, have found that the Government has established that she is a flight risk. (Doc. No. 164 at 18-20, 24-29;  Doc. No. 184 at 9-10, 12, n. 9.)  Both the magistrate judge and the trial judge have noted that Linda Schneider's situation concerning release or detention is different than that of her co-defendant and husband, Stephen Schneider.  Therefore, something more than the GPS monitoring and the other conditions imposed for Stephen Schneider's release are necessary to reasonably assure Linda Schneider's presence at trial.

At the February 2, 2009 hearing, Defendant identified only two "new" factors that they argue enter into the consideration of Linda Schneider's detention or release: (1) the Government's motion for a continuance indicating that there might be some conditions the parties could agree to that would allow her release (Doc. 210); and (2) the fact that the Government has taken an interlocutory appeal and the trial will be delayed.  (Doc. 306.)  The undersigned magistrate judge considered and discussed both of these matters in the Memorandum and Order of February 2, 2009, allowing Linda Schneider's release and setting the conditions,

including the requirement of a cash deposit of $100,000.  (Doc. 317 at 8-14.)  The

Court again explained why the conditions for Linda Schneider differ from the

conditions placed on her husband and co-defendant.  (Doc. 317 at 13-14.)  The

court continues to believe that a substantial cash deposit is necessary to reasonably

assure Linda Schneider's appearance at trial.  In fact, after reviewing Defendants

present financial information, the court feels even more strongly that such a

significant cash bond is necessary.

When the court set the conditions of release for the co-defendant, Stephen

Schneider, there were three components: (1) an Agreement to Forfeit Property

(Doc. 81); (2) an Appearance and Compliance Bond in the amount of $325,000

(Doc. 80); and Conditions of Release (Doc. 79) which included such conditions as

home confinement with electronic monitoring and/or GPS.  The first two

components were financial in nature, while the third component related generally

to non-financial conditions.  The order allowing Linda Schneider's release (Doc.

317) had substantially the same structure, but required that Linda Schneider's bond

be collateralized by a cash deposit and varied the other conditions of release

slightly.

The Agreement to Forfeit Property identified properties that had already

been seized and/or which were direct subjects of forfeiture actions, either in this

criminal case, or a related civil case, or both. This included such items as the Schneider Medical Clinic, the Haysville property and the Oklahoma property. These were items already in the possession of the United States and the agreement for forfeiture operated to assure that if Defendant fled, the process of completing those forfeitures could go forward. Notably, many of the assets covered by the forfeiture agreement were heavily mortgaged and/or other accounts were pledged as collateral. *See e.g.*, Defendant's Exhibit 1 (valuing the clinic as $1,300,000 and noting liens on the property by Valley State Bank of $1,075,000, as well as unpaid real estate taxes of approximately $100,000), and claiming that the Oklahoma property was subject to a lien to Linda Schneider's father that was equal to or greater than the value of the property). The Government has now obtained an order of interlocutory sale of the clinic and Defendants have never effectively had use of any of the value of the clinic for bonding purposes. The same is true of the other seized assets. While the agreement to forfeit such assets is of some value in deterring the possibility of flight, that value alone was not and is not sufficient to allow release of either defendant in this case.

The second financial component of release was the Appearance and Compliance Bond in the amount of $325,000. The amount of this bond was directly related to items of "substitute property" owned by Defendants, but which

the Government could not directly encumber on a pretrial basis in this case, and
other property that was not subject to any claims of forfeiture.  *See e.g.* <u>U.S. v.
Jarvis</u>, 499 F.3d 1198 (10th Cir. 2007) (holding that substitute assets identified in
connection with a forfeiture proceeding cannot be reached or restrained by the
Government in a pretrial situation.)  The bond amount for each defendant was
calculated as approximately one-half of the value of the "substitute assets" and
unencumbered assets as identified by the Government in their prior motion to
revoke appointed counsel.  *See* Doc. 16 at 6-9 (showing a total of unrestrained and
unencumbered assets in the approximate amount of $691,000).  These
unencumbered assets are the same assets identified in the Appendix as Items 1-6,
8-9, 11-13, 15-20.[8]  According to Defendant's valuation at the hearing, these assets
have now been depleted and are allegedly valued at only $63,694.43.  As a result,
the realistic value of the Appearance and Compliance Bond which was given for
purposes of assuring that Defendant does not flee, has effectively been reduced

---

[8]  In the February 5, 2009, hearing, the court referred to both the Agreement to
Forfeit Property and the Appearance and Compliance Bond, and sometimes misstated
which document was based upon the value of substitute or unencumbered assets and
which was based on assets that had already been seized. The only document, however,
that contains a specific dollar amount is the Appearance and Performance Bond in the
face amount of $325,000, and the above recitation correctly sets forth the operation of
both of these documents.

from $325,000 to approximately $64,000.[9]  As such, absent a significant cash deposit to collateralize the bond, it does not appear that forfeiture of the bond would "be a deeply felt hurt to the defendant and his family . . . so severe that defendant will return for trial rather than flee." U.S. v. Szott, 768 F.2d 159, 160 (7th Cir.1985).

Linda Schneider asked the court to reduce the cash deposit required pursuant to the Appearance and Compliance bond to $10,000.  Counsel suggested, but did not commit, that Defendant and her family might be able to meet a cash deposit amount somewhat higher -- but less than $60,000.  Obviously, if the court reduced the cash amount to only $10,000, this should be immediately available by simply cashing in a part of the E* Trade account.  However, such a small cash deposit would not be sufficient to reasonably assure Defendant's appearance at trial.  See e.g., United States v. Szott, 768 F.2d at 160 ("The statute does not require that a defendant be able to post the bail 'readily.'") Allowing the cash deposits in the

_____

[9]  The court wishes to be clear that the $325,000 bond was not truly secured by the substitute assets.  The amount of the bond was, however, based on the value of substitute assets that were not previously encumbered by the Government's forfeiture proceedings. Also, the court notes that there was no limitation placed on Defendants' ability to use those substitute assets for *bona fide* purposes.  The court does note from Defendant's Exhibit 1 that both defendants have apparently either completely liquidated assets or have significantly drawn down accounts in the sum of $249,381.29.  *See* Appendix, Items 2, 18, 19 & 20.  The court cannot ascertain from the exhibit precisely where these funds have been spent.  At the February 5 hearing, however, the Government did not take the position that the liquidation of most of these items appeared to be unreasonable.

range suggested by Defendant would not reasonably assure Linda Schneider's

appearance at trial.


## IV.   CONCLUSION

Nothing has occurred in this case which would change the findings of the

court in its prior orders that Linda Schneider is a flight risk.  Instead, with the trial

delay due to the Government's appeal and after considering the Government's

prior discussions of conditions that might allow her release, the court determined

that there are conditions that would allow her release while reasonably assuring her

appearance and the safety of the community.  Nothing Defendant has now

presented to the court, however, alters the court's conclusion that the conditions for

release of Linda Schneider must be more restrictive than the conditions of her

husband, and that the $100,000 cash deposit is the amount necessary.  The reasons

have been set out by the court in its prior opinions, which are adopted here, and

they include, *inter alia*, the fact that Linda Schneider has a prior conviction in this

court; the fact that she has more frequent and important connections with Mexico

than her husband; that she is allegedly "harboring" a fugitive (the person who was

the subject of her prior conviction and who authorities believe is now residing in

Mexico); and that she has property in Mexico, both real property and bank

accounts, which would enable her to easily flee and live in Mexico (and which she has refused to voluntarily encumber or repatriate to the U.S.A. during discussions with the Government).

For all of these reasons, the court finds that the $100,000 cash deposit for the Appearance and Compliance Bond  previously required for Linda Schneider's release in this case is necessary and appropriate, and is not excessive or used as any *de facto* basis for her continued detention.  Defendant's Request for Reconsideration of the Cash Requirements for Release Under the Bail Reform Act filed February 4, 2009 (Doc. 321), is therefore DENIED.

Defendant is advised of her right to have this Order reviewed by the district

court pursuant to 18 U.S.C. § 3145(a)(2).[10]

IT IS SO ORDERED.

Dated at Wichita, Kansas, this 9th day of February, 2009.

  s/   DONALD W. BOSTWICK   
DONALD W. BOSTWICK
United States Magistrate Judge

---

[10]  The court notes that after the February 5 hearing and before the filing of this Memorandum and Order on February, the Government filed a Motion to Modify Conditions of Release and Motion for Discovery (Doc. 325), which asks the court to modify the conditions of release of Stephen Schneider and the "proposed conditions" of release for Linda Schneider.  Shortly thereafter, Defendant Linda K. Schneider filed her Motion for Emergency Ruling Regarding Modification to Conditions of Release as to Linda K. Schneider.  (Doc. 326.)  The court reached the decision set out in this Memorandum and Order and had completed most of the draft of the Memorandum and Order before both of those motions were filed.  Moreover, the Court did not review either motion until it had completed its decision as set out in this Memorandum and Order and did not rely on any arguments made in either of those motions.  The court has now reviewed both motions and makes only the following comments at this time.  First, at the February 5 hearing, the Government did not ask for leave to file additional briefs on the bond issues related to Linda Schneider, and did not ask for time to conduct any discovery of information disclosed at the hearing.  Second, the Government's motion purports to be filed pursuant to 18 U.S.C. 3145(a)(1), see Doc. 325 at 2, which is not a request to the undersigned magistrate judge to amend his order or conditions under 18 U.S.C. § 3142(c)(3), but rather is a motion directed to the district judge seeking to revoke or amend the conditions of release set by the magistrate judge.  As such, it is not appropriate for this magistrate judge to consider any such arguments.  Finally, after two recent motions for expedited hearings and/or rulings, Doc No's 315, 321, Defendant Linda Schneider now captions the recent motion as one seeking an "emergency ruling."  The court has issued this Memorandum and Order less than two business days after the conclusion of the expedited hearing given to defendant on February 5, and therefore assumes that this Memorandum and Order meets Defendant's description of an emergency ruling.