IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(WICHITA DOCKET)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07-10234-MLB |
| | ) | |
| STEPHEN J. SCHNEIDER, | ) | Count 1:      18 U.S.C. § 371 |
| and | ) | Counts 2-6:   21 U.S.C. § 841(a)(1) |
| LINDA K. SCHNEIDER, a/k/a | ) | Counts 7-17:  18 U.S.C. § 1347 |
| LINDA K. ATTERBURY, | ) | Counts 18-34: 18 U.S.C. § 1957 |
| d/b/a SCHNEIDER MEDICAL CLINIC, | ) | Counts 1-34:  18 U.S.C. § 2 |
| | ) | Forfeiture |
| Defendants. | ) | |
| _____ | ) | |

## THIRD SUPERSEDING INDICTMENT

The Grand Jury charges:

At all material times:

### INTRODUCTION

1.      Until January 29, 2008, when the Kansas Board of Healing Arts suspended his license to practice medicine, defendant **STEPHEN J. SCHNEIDER** was a doctor of osteopathic medicine, licensed in Kansas, and board certified in family medicine.

2.      Until March 31, 2008, when her licensed expired, defendant **LINDA K. SCHNEIDER, a/k/a LINDA K. ATTERBURY**, was a Licensed Practical Nurse ("LPN").

3.      On or about June 4, 2002, defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** organized Schneider Medical Clinic, L.L.C. ("the Clinic"), and by the Fall of 2002, opened a newly-built medical clinic at 7030 S. Broadway Street,

Haysville, Kansas.  Since its inception, defendants **STEPHEN J. SCHNEIDER** and

**LINDA K. SCHNEIDER** have owned and operated the Clinic, and defendant **LINDA K.**

**SCHNEIDER** has served as the general manager of the Clinic.  In her capacity as

general manager of the Clinic, defendant **LINDA K. SCHNEIDER** directed Clinic

operations, including hiring and firing staff, how the Clinic scheduled patients, and how

the Clinic billed Health Care Benefit Programs for medical services the Clinic ostensibly

provided.

4.      From at least in or about January 2002, and continuing to in or about

January 2008, defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER**

purported to be providing "Pain Management" treatment for chronic pain patients

through family medical practices, including the Clinic.  Defendants **STEPHEN J.**

**SCHNEIDER** and **LINDA K. SCHNEIDER** did not operate a legitimate medical practice,

but instead were engaged in a conspiracy and scheme to distribute and dispense

controlled substances illegally, to defraud Health Care Benefit Programs of money, and

to defraud patients of money by running what was, in essence, a "prescription mill" and

a "narcotics delivery system", commonly known as a "Pill Mill."

5.      From its establishment through in or about January 2008, the Clinic

employed approximately 10 different Physician's Assistants, with 1 to 3 Physician's

Assistants being employed at any one time.   Physician's Assistants are considered to

be "mid-level practitioners" and are licensed to provide health care under the

supervision of a physician.  Defendant **STEPHEN J. SCHNEIDER** supervised

Physician's Assistants, and countersigned patient charts when a Physician's Assistant

saw the patients.  The Clinic hired many of the Physician's Assistants right out of school.  Most had no specialized training or experience in Pain Management, and the Clinic provided no such training.

6.     The Clinic did not employ registered nurses or licensed practical nurses, but instead employed individuals the Clinic called "medical assistants," most of whom had no prior or formal medical training.  Training the medical assistants did receive, if any, occurred on the job.  The Clinic had a high degree of turnover with the medical assistants, so many that defendant **STEPHEN J. SCHNEIDER** could not remember their names.

7.     Defendant **LINDA K. SCHNEIDER** hired a number of family members and family friends at the Clinic, including a Physician's Assistant who is her brother, and the Clinic Administrator, who is a family friend.  Additionally, defendant **LINDA K. SCHNEIDER** hired Ulises Eric Taylor as her second-in-command at the Clinic, after helping him fraudulently apply for a social security number by falsely representing to the Social Security Administration that he was her adopted son from Romania.  Mr. Taylor, who had no medical training, was involved with all aspects of the Clinic, as was defendant **LINDA K. SCHNEIDER**.

8.     Prior to establishing Schneider Medical Clinic, defendant **STEPHEN J. SCHNEIDER** primarily practiced family medicine.  However, after establishing Schneider Medical Clinic, defendant **STEPHEN J. SCHNEIDER** began focusing his practice on "Pain Management," described more fully below.  The vast majority of the individuals receiving controlled substances from the Clinic for "Pain Management" were

3

being treated for general complaints of pain and not for cancer or other life-threatening medical conditions.

9.      Defendant **STEPHEN J. SCHNEIDER** has denied under oath that he is a Pain Management specialist.

10.     Defendant **STEPHEN J. SCHNEIDER** was known in Sedgwick County and elsewhere to be a physician who liberally prescribed drugs on request, and was referred to as "Schneider the Writer," "the pill man," and "the candy man."  In his Application for Credentialing with the American Academy of Pain Management, defendant **STEPHEN J. SCHNEIDER** stated: "I am one of the leading writers for narcotics in the State of Kansas."

11.     As a result of the defendants' operating a Pill Mill instead of a legitimate medical practice, that is, as a result of their conspiracy to illegally distribute controlled drugs and scheme to defraud, numerous patients were hospitalized due to overdoses of prescribed drugs, and numerous patients died of such overdoses.  Beginning at least as early as February 2002, defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** were on repeated notice that their purported "pain management treatment" practices were resulting in patient deaths and overdoses, yet the defendants did nothing to alter their practices.  Consequently, deaths and overdoses continued.  At least the following number of defendants' patients – **68** – died of drug overdoses in the following years, from in or about February 2002, and continuing through in or about February 2008:

2002          2

4

| 2003 | 13 |
|------|-----|
| 2004 | 13 |
| 2005 | 17 |
| 2006 | 10 |
| 2007 | 11 |
| 2008 | 2 |

The average age of these patients was 41, with the youngest being 18 years old, and the oldest being 61.

**Controlled Substances**

12.    The Controlled Substances Act prohibits the distribution and dispensing of various listed drugs, including narcotics that are prescribed by physicians and other licensed health care providers.  Licensed health care providers may distribute and dispense controlled substances if they have a DEA Registration Number, and if they comply with all DEA regulations and all applicable federal laws.

13.    Federal law provides that licensed health care professionals may only issue a prescription for a controlled substance if they are doing so in the usual course of his/her professional practice and for a legitimate medical purpose.  Therefore, health care providers that prescribe controlled drugs, like narcotics, outside the usual course of professional medical practice and not for a legitimate medical purpose, are violating the Controlled Substances Act and illegally distributing drugs.  For example, it has long been the recognized law that a prescription is not for a legitimate purpose or within the usual course of professional medical practice if the health care provider issues the

5

prescription knowing that the person to whom it is issued is abusing or diverting the controlled substances.

14.     Defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** distributed, dispensed, and caused to be distributed and dispensed, without a legitimate medical purpose and outside the usual course of professional medical practice, at least the following controlled substances:

(a)     **Schedule 2 drugs**, that is, drugs that are used with severe restrictions because of their potential for abuse, which abuse may lead to severe psychological or physical dependence, including: Fentanyl (e.g., Actiq, Duragesic); Methadone;  Morphine (e.g., Avinza); and Oxycodone (e.g., Oxycontin, Percocet);

(b)     **Schedule 3 drugs**, that is, drugs having a potential for abuse less than the drugs in Schedule 2, but drugs which, if abused, may lead to moderate or low physical dependence or high psychological dependence, including: Hydrocodone (e.g., Lortab).

(c)     **Schedule 4 drugs**, that is, drugs with a low potential for abuse relative to the drugs in Schedule 3, but drugs which, if abused, may lead to limited physical dependence or psychological dependence, including: Alprazolam (Xanax) and Diazepam (Valium).

15.     Controlled drugs can be used for pain relief and can be short-acting or long-acting.  Short-acting narcotics (e.g., Hydrocodone) have a higher chance of addiction than long-acting narcotics (e.g., Morphine, Methadone).  Additionally, a

combination of short-acting narcotics and short-acting benzodiazepines (e.g., Xanax, Valium) has a higher propensity for addiction.

16.     In addition to narcotics and benzodiazepines, other prescribed drugs, even though not "controlled substances," can also cause dependence.  An example is Carisoprodol, commonly known as Soma, which is a muscle relaxant.

17.     Prescribed drugs can be misused or abused.  Misuse is the unintentional inappropriate use of a medication, either due to a misunderstanding of directions or because of a confused state.  Abuse is the intentional inappropriate use of a medication, either by overusing the medication or by taking it for a purpose not prescribed.

**The Practice of Pain Management**

18.     Chronic pain can be a debilitating condition.  Patients with chronic pain are entitled to receive appropriate medical care to relieve their pain, including the prescription of controlled drugs.  Pain Management is a recognized specialty involving the treatment of chronic pain. The goal of Pain Management is to decrease or control pain, while maintaining or increasing a patient's ability to function and the patient's quality of life.

19.     In 1998, to give guidance to health care providers practicing Pain Management, the Kansas Board of Healing Arts, which regulates the practice of medicine in the State of Kansas, adopted *Guidelines for the Use of Controlled Substances for the Treatment of Pain*.

20.     Although it is lawful for a physician to prescribe controlled drugs to a person suffering from chronic pain, the physician must still issue the prescription for a

7

legitimate medical purpose and within the usual course of professional medical practice. A prescription for controlled drugs is illegal when a provider issues the prescription, knowing that the person to whom it is issued is abusing or diverting the controlled drugs.

21.     It is a fundamental precept of medicine that a health care provider should "first do no harm" and should provide honest services to a patient, as opposed to providing services driven by a desire to enhance the provider's income.  In Pain Management, to "do no harm," the treatment should not result in greater risks to the patient than the condition being treated, especially if the risks of treatment are life-threatening, and the underlying condition is not.

22.     If a provider practicing Pain Management makes a patient worse, and the provider does not change the course of treatment, the provider is not practicing legitimate medicine.

23.     Although uncommon, one of the most important risks of the long-term prescribing of controlled drugs for chronic pain is the development of an addiction problem, or the worsening of a previous addiction problem.   Risks of addiction increase if the patient has a psychiatric history, or a non-opiate addiction history, and risks of addiction significantly increase if the patient has a current or historical addiction to cocaine or opiates.  Addiction or addictive behavior is a strong indication to cease prescribing controlled drugs, even if there is an established legitimate medical purpose for the prescriptions.

24.     Continuing to prescribe controlled drugs to a patient who is demonstrating aberrant behavior is doing harm to the patient.  If this situation continues, it indicates

8

that the prescribing is for other than a legitimate medical purpose and is outside the usual course of professional medical practice.

25.     To prevent addiction to, and abuse and diversion of, the controlled drugs they prescribe, health care providers look for recognized "red flags" and "scams" that may indicate a patient may be abusing or diverting the prescribed drugs. These red flags and scams include:

(a)     requests for early refills;

(b)     specific requests for particular drugs;

(c)     claims that certain drugs do not help pain;

(d)     a reluctance to change medications;

(e)     drug screens showing the presence of controlled drugs the provider did not prescribe, or the presence of illegal controlled drugs, or failing to show all of the controlled drugs prescribed;

(f)     claims that drugs were lost, stolen or destroyed;

(g)     anonymous tips or tips from family members regarding a patient's abuse or diversion of the drugs;

(h)     obtaining controlled drugs from multiple providers ("doctor shopping"); and

(i)     using more than one pharmacy to fill prescriptions ("polypharmacy").

26.     The Medicaid program has implemented various policies to address prescription drug abuse by patients it insures.  Sometimes called the "lock-in" program, patients are limited to receiving services from only one doctor or pharmacy.  A doctor accepting a "lock-in" Medicaid patient is on notice that the patient has either had a

9

prescription drug abuse problem or has the potential of having a prescription drug abuse problem.  The Clinic accepted Medicaid "lock-in" patients.

27.     Typically, Pain Management practitioners employ the use of a Pain Management Agreement that outlines the conditions under which the provider agrees to provide the patient with controlled drugs and informs the patient that prescriptions for controlled drugs will not be issued if the patient violates the terms of the agreement.

28.     Overdoses and overdose deaths are rare in a legitimate pain management practice.  At the Clinic, overdoses and overdose deaths were relatively common.

**COUNT 1 – CONSPIRACY**

29.     The Grand Jury incorporates by reference Paragraphs 1 through 28 as though fully restated and re-alleged herein.

30.     Beginning in at least January 2002, and continuing to in or about January 2008, the exact dates being unknown to the Grand Jury, in the district of Kansas, the defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** knowingly and willfully combined, conspired, confederated, and agreed with each other and with other persons, both known and unknown to the Grand Jury:

(a)     to commit offenses against the United States, that is:

(1)     distribution and dispensing of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1);

(2)     health care fraud, in violation of Title 18, United States Code, Section 1347;

10

(3)     engaging in illegal monetary transactions, in violation of Title 18,

United States Code, Section 1957; and

(b)     to defraud the United States and departments and agencies thereof,

namely, the Department of Health and Human Services and the Centers for

Medicare and Medicaid Services (formerly the Health Care Financing

Administration), by impairing, impeding, and obstructing by craft, trickery,

deceit, and dishonest means, their lawful and legitimate functions in

administering health care and health plans, including Medicare and

Medicaid.

### Purpose of the Conspiracy

31.     A purpose of the conspiracy was to make money for the conspirators

through a scheme, both to distribute and dispense controlled drugs illegally and to

defraud, through which defendants **STEPHEN J. SCHNEIDER** and **LINDA K.**

**SCHNEIDER** and others made materially false and fraudulent claims, and caused

materially false and fraudulent claims to be made, to Health Care Benefit Programs, and

through which defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** and

others deprived patients of money.

### Manner and Means

32.     Defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** and

others used the following manner and means in furtherance of the conspiracy and

scheme to distribute and dispense controlled substances and to defraud Health Care

Benefit Programs and patients.  In so doing, defendants **STEPHEN J. SCHNEIDER** and

**LINDA K. SCHNEIDER** and others, at times, used and perverted otherwise lawful conduct to further the conspiracy and scheme.

33.     During the course and in furtherance of the conspiracy and scheme, defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** ran what was, in essence, a "prescription mill" and a "narcotics delivery system", commonly known as a "Pill Mill", which involved:

    (a)     defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** and others ostensibly offering patients "Pain Management" by doing little more than writing prescriptions for narcotics and other controlled drugs the patients requested, which prescriptions were illegal because they were not for a legitimate medical purpose, and not within the usual course of professional medical practice; and

    (b)     defendants  **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** submitting and causing materially false and fraudulent claims to be submitted to Health Care Benefit Programs for –

        (1)     services not provided;

        (2)     upcoded services, that is, services billed at a higher rate than the services actually provided; and

        (3)     prescriptions issued not for a legitimate medical purpose and not within the usual course of professional medical practice.

34.     During the course and in furtherance of the conspiracy and scheme, defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** owned and operated

Schneider Medical Clinic.  Although the Clinic was ostensibly a family medical clinic, it did not operate like a typical family medical clinic, in at least the following respects:

(a)     The Clinic was open 7 days per week, for as many as 11 hours per day. Defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** were typically at the Clinic only on weekdays, for only 8 hours per day, leaving promptly at 5:00 p.m.  On Wednesdays, the defendants typically did not work during the afternoon.  Defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** scheduled and took one-hour lunches every day, frequently as the guests of pharmaceutical sales representatives.

(b)     During lunch, after 5:00 on weekdays, and on weekends, Physician's Assistants typically manned the Clinic alone, without physicians present. Physician's Assistants were required to see walk-in patients, while physicians were not.

(c)     The Clinic had a high concentration of Pain Management patients, and the Clinic providers prescribed a large quantity of controlled drugs.  When defendant **LINDA K. SCHNEIDER** interviewed prospective employees, she often bragged that the Clinic wrote more narcotics prescriptions than any other medical clinic in the State of Kansas.

(d)     Prior to Physician's Assistants receiving their Drug Enforcement Administration number allowing them to prescribe controlled drugs, defendant **STEPHEN J. SCHNEIDER** would give the Physician's Assistants prescription pads that he had pre-signed so that they could

13

issue prescriptions for controlled drugs when he was not present at the Clinic.

35.    During the course and in furtherance of the conspiracy and scheme, defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** and others caused harm to the Clinic's patients by placing economic incentives above good medical practices and appropriate medical judgment, and by emphasizing volume over quality of care.

36.    During the course and in furtherance of the conspiracy and scheme, defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** and other Clinic providers sometimes had Pain Management patients sign a Pain Management Agreement, which provided that the patient would not be given prescriptions for any early refills of controlled drugs, and indicated that prescriptions for controlled drugs would no longer be issued if any of the following occurred: (1)  the patient obtained prescriptions for narcotics from more than one health care provider; (2) the patient used more than one pharmacy to fill prescriptions; (3) the patient failed a drug screen either due to the presence of controlled drugs not prescribed; the absence of controlled substances prescribed; or the presence of illegal controlled substances.  Despite these provisions, defendant **STEPHEN J. SCHNEIDER** and other Clinic providers routinely gave patients early refills, and routinely continued issuing prescriptions for controlled drugs to Pain Management patients who had doctor-shopped, filled prescriptions at multiple pharmacies, and had failed urine drug screens.

37.    During the course and in furtherance of the conspiracy and scheme, defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** reversed other Clinic providers' decisions to terminate a patient from Pain Management treatment, and thereafter treated these patients as "VIP" patients who only defendant **STEPHEN J. SCHNEIDER** would see and to whom he would continue to prescribe controlled drugs.

38.    During the course of and in furtherance of the conspiracy and scheme, defendant **STEPHEN J. SCHNEIDER** and others prescribed controlled drugs to patients, which prescriptions were not for a legitimate medical purpose, and were not within the usual course of professional medical practice, as evidenced by defendant **STEPHEN J. SCHNEIDER** and others:

(a)    indiscriminately prescribing:

(1)    controlled drugs in excessive and escalating amounts, that is, prescriptions of controlled drugs out of proportion to the alleged disease being treated;

(2)    redundant controlled drugs; and

(3)    combinations of controlled drugs and non-controlled, but addictive, drugs;

(b)    prescribing controlled drugs in the type and amount a patient requested;

(c)    relentlessly continuing to prescribe controlled drugs in the face of patients' deteriorating conditions, contraindications, and despite obvious signs of abuse, including:

(1)    multiple "red flags;"

15

(2)    scams for early refills;

(3)    failed urine drug screens;

(4)    violations of the Pain Management Agreements; and

(5)    calls from friends and family members reporting abuse, diversion, and/or addiction;

(d)    failing to adapt treatment plans in the face of patients' deteriorating conditions and despite obvious signs of abuse;

(e)    prescribing controlled drugs in a way that was likely to cause and did cause dependence and addiction or that fed existing addictions, including:

(1)    long-term prescribing of short-acting analgesics, often in combination with benzodiazepines;

(2)    prescribing early refills that allowed patients to either self-escalate the amount of drugs ingested or to stockpile the drugs; and

(3)    prescribing combinations of drugs that were known to have heroin-like effects, including the combination of Lortab, Xanax, and Soma, referred to as the "holy trinity" by prescription drug abusers;

(f)    failing to treat the causes of patients' pain or other diseases, and instead treating only the pain;

(g)    failing to conduct adequate medical evaluations, including failing to do one or more of the following:

(1)    perform a thorough physical examination;

(2)    obtain a thorough history;

(3)    obtain prior medical records;

16

(4)     obtain information about prior addiction or abuse; and

(5)     perform objective medical tests;

(h)     failing to monitor or use objective treatment information, including:

(1)     failing to obtain urine drug screens on a consistent and timely basis, including failing to conduct urine drug screens on at least **31** individuals who eventually died of drug overdoses;

(2)     disregarding results of urine drug screens, including at least **31** individuals who had failed urine drug screens and who eventually died of drug overdoses;

(3)     failing to document the existence and/or significance of objective test results;

(4)     failing to complete Pain Assessment Diagnostic Tools; and

(5)     ignoring patients' inconsistent and incomplete answers to Pain Assessment Diagnostic Tools;

(i)     failing to prevent diversion of controlled drugs amongst and between family members receiving ostensible Pain Management treatment at the Clinic;

(j)     failing to adequately document the medical justification for prescribing, increasing dosages of, or changing controlled substances;

(k)     failing to monitor for toxic levels of Tylenol in the drugs prescribed;

(l)     prescribing controlled drugs to minors;

(m)    after patients overdosed on prescribed controlled drugs, continuing to prescribe the same controlled drugs on which patients overdosed; and

(n)     continuing to prescribe controlled drugs in the same manner, despite notice that the Clinic's prescription practices resulted in:

    (1)     increased scrutiny by Health Care Benefit Programs;

    (2)     obvious drug-seeking behavior and addiction;

    (3)     numerous patient overdoses; and

    (4)     numerous patient deaths.

39.     During the course and in furtherance of the conspiracy and scheme, defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** had notice that their Clinic practices resulted in numerous deaths and overdoses from controlled drugs the Clinic prescribed, but defendants took no action to change Clinic practices to prevent additional deaths or overdoses.  When notified of patient deaths from overdoses, defendant **STEPHEN J. SCHNEIDER** blamed the patients for abusing the prescribed drugs, often referring to them as "bad grapes."

(a)     During the course of the conspiracy and scheme, at least **68** patients died of drug overdoses involving drugs prescribed by defendant **STEPHEN J. SCHNEIDER**, by health care providers under his supervision and control, and by health care providers Schneider Medical Clinic employed.

(b)     Through their illegal distribution and dispensing of controlled drugs and health care fraud, defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** and others contributed to the death of at least **21** individuals, and of those **21**, directly caused the death of at least **4** individuals.

18

(c)   For the years 2003 through 2007, Schneider Medical Clinic patients who died of drug overdoses accounted for approximately 18% of all such deaths in Sedgwick County, Kansas, and surrounding areas.  In this same time period, the highest number of drug overdose deaths associated with any other doctor was 9, and that doctor specialized in treating HIV/AIDS patients.

(d)   During the years 2003 through 2006, Schneider Medical Clinic patients were admitted to one Wichita hospital Emergency Room for overdoses on approximately **94** occasions.  By comparison, all other doctors accounted for an average of less than 5 overdoses each.

40.   During the course and in furtherance of the conspiracy and scheme, through their illegal distribution and dispensing of controlled drugs and health care fraud, defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** and others caused Schneider Medical Clinic patients to become addicted to prescribed drugs for which the patients had to seek treatment.

41.   During the course and in furtherance of the conspiracy and scheme, and because of their illegal distribution and dispensing of controlled drugs and health care fraud, defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** submitted claims and received payment for medical services not provided, and caused Health Care Benefit Programs to pay for illegal prescriptions issued.

42.     During the course and in furtherance of the conspiracy and scheme, the defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** operated the Clinic to maximize billing opportunities.  For example:

(a)     Patients were scheduled every 10 minutes.

(b)     Non-emergency walk-in patients were "worked in" to the schedule in addition to scheduled patients.

(c)     Providers who spent too much time with patients were encouraged to speed up the visits with knocks on the examination room doors, and/or defendant **LINDA K. SCHNEIDER** pacing outside the examination rooms and admonishing slow providers to pick up the pace.  Defendant **LINDA K. SCHNEIDER** praised those providers who saw large numbers of patients and encouraged others to follow their example.

(d)     Clinic providers often saw more than one patient at a time, and sometimes saw a whole family of patients simultaneously in a single examination room.

(e)     Defendant **LINDA K. SCHNEIDER** often prioritized which patients would be seen by the type of insurance the patients had.  As a result of this prioritization practice, and the practice of seeing walk-ins, some patients waited as many as 3 to 4 hours for rushed visits lasting only long enough for a provider to write a prescription.

(f)     Defendant **STEPHEN J. SCHNEIDER** and others prescribed controlled drugs and other drugs at such dosage frequencies, in such amounts, and

in such combinations, as were likely to cause and that did cause patients to become dependent on those drugs, and to become dependent on the Clinic for providing prescriptions for those drugs, necessitating the patients' return visits to the Clinic for ostensible "office visits" to obtain the prescriptions.

(g)     Defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** required Pain Management patients to: (1) return to the Clinic at least monthly for office visits; (2) schedule office visits to obtain lab results; and (3) schedule office visits to obtain prescription refills.

(h)     Defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** instructed providers to indicate that they had provided a higher-paying office visit service, known as a 99213 Office Visit, even though they had not provided such service.  Both defendants changed Fee Tickets (the document the Clinic billing staff used to determine what services should be billed to Health Care Benefit Programs), indicating that the higher-paying 99213 service had been provided, when it had not been provided, resulting in the Clinic receiving monies to which it was not entitled.

(i)     Defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** submitted claims to Health Care Benefit Programs for CPT Code 99213 for approximately 83% of all office visits billed, regardless of the true nature of the office visit, ensuring maximum payment for minimal time, while at the same time avoiding scrutiny by the Health Care Benefit Programs by rarely

billing the highest office visit codes, 99214 and 99215, which the Programs
often audited.

(j)      Defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** billed
for services as though defendant **STEPHEN J. SCHNEIDER** had provided
the services, even though he could not have provided the services because
he was not in the Clinic, but was instead attending continuing medical
education, out of town, or out of the country in Mexico.

(k)      For approximately 27% of the days for which defendant Defendants
**STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** submitted claims
for defendant **STEPHEN J. SCHNEIDER'S** services, the number and types
of claims submitted would indicate that defendant **STEPHEN J.
SCHNEIDER** had been present at the Clinic providing medical services for
12 or more hours per day, even though he did not work such hours.

(l)      Defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** and
others utilized a "checklist" on patient progress notes to indicate falsely that
providers had performed thorough physical examinations, when, in truth
and in fact, the providers performed only cursory physical examinations, if
any.

43.      During the course and in furtherance of the conspiracy and scheme, the
defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** emphasized volume
over quality of care.  For example:

22

(a)     Claims the Clinic submitted to Health Care Benefit Programs indicate that individual providers billed for ostensibly providing services to 50 or more patients per day on a regular basis.  During the period January 2003 through September 2005, defendant **STEPHEN J. SCHNEIDER** billed for ostensibly providing services to 50 or more unique patients per day for approximately 20% of the days on which he billed services.  For example, on March 4, 2005, defendant **STEPHEN J. SCHNEIDER** billed for ostensibly providing office visit services to 113 unique patients.

(b)     Health care providers who worked at the Clinic describe the environment as overwhelming and chaotic.  There was an overwhelming number of patients to be seen, resulting in rushed and insufficient examinations.  Patients' medical records or "charts" were often missing, or the charts were missing key documentation.  Medical records were illegible and scant.

(c)     The Clinic fragmented patient care among the various providers, with patients seeing multiple providers.  Consequently, the chaotic environment, including the poor documentation, resulted in both poor quality of care and opportunities for patients to obtain inappropriate early refills of controlled drugs.

(d)     Although health care providers complained to defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** about the overwhelming workload and chaotic working conditions, the Clinic continued to operate in the manner described above.

23

44.     During the course and in furtherance of the conspiracy and scheme, the defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** received substantial income from the Health Care Benefit Programs.  The Clinic submitted claims for ostensible medical services to approximately 93 Health Care Benefit Programs and received over $4.24 million in payments.  The majority of that $4.24 million, or approximately 87%, came from 5 Health Care Benefit Programs, namely: (1) Medicaid; (2) Medicaid's HMO, First Guard; (3) Medicare; (4) Blue Cross/Blue Shield of Kansas; and (5) Preferred Health Systems.

45.     During the course and in furtherance of the conspiracy and scheme, the defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** submitted claims for approximately 83% of all office visits under one office visit code – 99213 – and received approximately $2.31 million, or approximately 54% of their Clinic income, for that one office visit code.  As compared to other family practices in Kansas, this amount of income from a 99213 office visit code is aberrant. Approximately 63% of the Clinic's income came from office visits ostensibly provided to "Pain Management" patients.

46.     During the course and in furtherance of the conspiracy and scheme, the defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** and others caused claims to be submitted for controlled drugs, and Health Care Benefit Programs paid at least and approximately $6.06 million for those drugs.

47.     During the course of and in furtherance of the conspiracy and scheme, defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** deprived patients of monye by seeking payments from patients for services that were not within the usual

24

course of professional medical practice, and by causing patients to pay for prescriptions that were not issued for a legitimate medical purpose, nor within the usual course of professional medical practice.

48.     During the course of and in furtherance of the conspiracy and scheme, defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** and others falsified documents in support of claims submitted to Health Care Benefit Programs, including falsifying patients' vital signs (e.g., pulse, blood pressure, temperature, respiration rate), filling in missing information for audits, forging referral forms, creating false referrals to specialists, and forging patients' signatures on Pain Management Agreements.

49.     During the course of and in furtherance of the conspiracy and scheme, and following audits by Medicaid and First Guard, defendant **LINDA K. SCHNEIDER** instructed Clinic providers to not write "chart not available" in progress notes, and further instructed Clinic providers and other staff to not write in the chart that the purpose of the visit was "med refills."

50.     During the course of and in furtherance of the conspiracy and scheme, defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** and others engaged in convoluted financial transactions in an attempt to conceal the source of their assets and to place these assets outside the government's reach.

### Overt Acts

51.     In furtherance of the conspiracy and scheme and artifice to defraud, and to accomplish their purposes and objectives, one or more co-conspirators committed in the District of Kansas the following overt acts, among others:

25

(a)     Each of the allegations set forth in Counts 2-34 is incorporated and re-alleged as though restated herein, as an individual overt act done in furtherance of the conspiracy.

(b)     On or about June 4, 2002, defendant **STEPHEN J. SCHNEIDER** organized Schneider Medical Clinic, L.L.C., in the State of Kansas.

(c)     On or about July 10, 2002, defendant **LINDA K. ATTERBURY** organized Schneider Medical Properties, L.L.C., in the State of Kansas.

(d)     On or about March 31, 2003, defendants opened Valley State Bank Account Number XXX012 in the name of Schneider Medical Properties, L.L.C.

(e)     On or about April 12, 2004, defendants opened Credit Union of America Account Number XXX678 in the names of Linda K. Atterbury and Stephen Schneider.

(f)     On or about January 4, 2005, defendants **STEPHEN J. SCHNEIDER and LINDA K. SCHNEIDER, a/k/a LINDA K. ATTERBURY** falsely informed First Guard that they had hired a pain management consultant to improve the Clinic's practices concerning the prescribing of controlled substances.

(g)     On or about June 9, 2005, defendant **LINDA K. SCHNEIDER** caused Account Number XXX131 to be opened at Credit Union of America, in the names of her parents, Lee E. Atterbury and Ellen M. Atterbury, with the pay-on-death beneficiary being defendant Linda Atterbury.

(h)     On or about January 17, 2007, defendant **STEPHEN J. SCHNEIDER** executed a Promissory Note, payable to L. E. Atterbury, in the amount of $180,000, secured by a Real Estate Mortgage on real property located in Delaware County, Oklahoma, for the purpose of hiding assets from, or placing assets beyond the control of, the government.

(i)     From in or about December 2002 through in or about March 2007, defendant **STEPHEN J. SCHNEIDER** and others prescribed controlled substances to approximately 76 unique individuals, all of whom presented to Wichita-area Emergency Rooms with symptoms of overdose or withdrawal, and some of whom presented multiple times with such symptoms, resulting in a total of at least 107 incidences.  Following their overdoses, these individuals returned to the Schneider Medical Clinic, and defendant **STEPHEN J. SCHNEIDER** and others continued to prescribe controlled substances to them.  On approximately 76 occasions, the individuals who had overdosed received prescriptions for controlled substances after their overdoses, and on approximately 47 occasions they received prescriptions for the same controlled substances on which they overdosed.

(j)     Between on or about the dates indicated below, defendant **STEPHEN J. SCHNEIDER** and other Schneider Medical Clinic providers prescribed controlled substances and other medications to the 68 below-named individuals, all of whom eventually died on the dates indicated below.  The manner of death for all but five individuals was accident.  The manner of

27

death for Danny C and Russell H was suicide, and the manner of death for Heather M, Donna D, and Rebecca T was undetermined.  The primary cause of death for all but six individuals was "mixed drug intoxication" or prescription drug overdoses.  For four individuals (Boyce B, Terry C, Jon P, Mary S), prescription drug overdose was a contributing cause of death.  One individual (Marie H) died from a cocaine overdose, and one individual (Vickie H) did not have an autopsy, but defendant **STEPHEN J. SCHNEIDER** signed her death certificate, claiming that she had died of a an acute myocardial infarction (*i.e.*, a heart attack):

| Name | Age | On or about 1st Office Visit | On or about Last Office Visit | On or about Date of Death |
|---|---|---|---|---|
| Heather M | 28 | Aug. 27, 2001 | Feb. 8, 2002 | Feb. 9, 2002 |
| Billie R | 45 | Oct. 19, 2001 | May 2, 2002 | May 4, 2002 |
| William M | 36 | Nov. 12, 2002 | Jan. 28, 2003 | Feb. 4, 2003 |
| Leslie C | 49 | April 9, 1996 | Feb. 9, 2003 | Feb. 14, 2003 |
| David B | 47 | Nov. 18, 2002 | March 12, 2003 | March 15, 2003 |
| Terry C | 48 | Oct. 12, 2001 | April 8, 2003 | April 14, 2003 |
| Lynnise G | 35 | May 23, 2002 | April 23, 2003 | April 30, 2003 |
| Mary S | 52 | Feb. 6, 2003 | June 11, 2003 | June 16, 2003 |
| Dustin L | 18 | June 26, 2003 | June 26, 2003 | June 27, 2003 |
| Marie H | 43 | Dec. 24, 2002 | May 28, 2003 | June 30, 2003 |
| Jessie D | 21 | March 4, 2003 | June 27, 2003 | July 11, 2003 |
| Boyce B | 59 | June 29, 2003 | July 23, 2003 | July 25, 2003 |
| Kandace B | 43 | July 10, 2003 | Nov. 12, 2003 | Nov. 14, 2003 |
| Katherine S | 46 | July 9, 2003 | Nov. 19, 2003 | Nov. 25, 2003 |
| Robert S | 31 | June 2, 2003 | Dec. 7, 2003 | Dec. 8, 2003 |

| Name | Age | On or about 1st Office Visit | On or about Last Office Visit | On or about Date of Death |
|------|-----|------------------------------|-------------------------------|----------------------------|
| Deborah S | 44 | Jan. 3, 2003 | May 5, 2003 | Feb. 5, 2004 |
| Shannon Mi | 38 | July 27, 2003 | Dec. 9, 2003 | Feb. 23, 2004 |
| Danny C | 35 | April 21, 2003 | March 5, 2004 | March 6, 2004 |
| Vickie H | 53 | June 26, 2003 | March 16, 2004 | April 11, 2004 |
| James C | 33 | March 3, 2004 | June 8, 2004 | June 9, 2004 |
| Shannon Me | 25 | July 24, 2003 | June 4, 2004 | June 22, 2004 |
| Ancira W | 45 | Sept. 25, 2002 | June 15, 2004 | July 12, 2004 |
| Darrell H | 24 | Nov. 12, 2002 | July 15, 2004 | July 17, 2004 |
| Michael H | 37 | March 9, 2004 | Aug. 26, 2004 | Sept. 12, 2004 |
| Patricia C | 43 | Nov. 8, 2001 | Oct. 4, 2004 | Oct. 6, 2004 |
| Jon P | 36 | April 23, 2004 | Oct. 8, 2004 | Oct. 20, 2004 |
| Tresa W | 43 | Sept. 15, 2003 | Nov. 29, 2004 | Dec. 16, 2004 |
| Jeff H | 45 | Jan. 10, 2003 | Dec. 8, 2004 | Dec. 29, 2004 |
| Russell H | 24 | Aug. 23, 2003 | Jan. 12, 2005 | Jan. 19, 2005 |
| Michael B | 48 | Sept. 30, 2004 | Jan. 28, 2005 | Feb. 2, 2005 |
| Amber G | 22 | Aug. 13, 2003 | Jan. 3, 2005 | Feb. 26, 2005 |
| Christine B | 45 | Dec. 11, 2001 | Dec. 3, 2004 | April 7, 2005 |
| Victor J | 48 | Jan. 24, 2005 | April 15, 2004 | April 22, 2005 |
| Randall P | 44 | March 10, 2005 | April 22, 2005 | May 3, 2005 |
| Michael F | 49 | Jan. 10, 2005 | May 9, 2005 | May 11, 2005 |
| Deborah M | 52 | Feb. 23, 2005 | May 4, 2005 | May 15, 2005 |
| Patricia G | 49 | Feb. 1, 2003 | June 18, 2005 | June 20, 2005 |
| Dustin B | 22 | Jan. 20, 2005 | Feb. 27, 2005 | June 21, 2005 |
| Jerad M | 24 | July 9, 2004 | June 13, 2005 | June 22, 2005 |
| Earl A | 29 | Sept. 22, 2004 | June 29, 2005 | July 3, 2005 |
| Brad S | 53 | Oct. 15, 2004 | June 30, 2005 | July 11, 2005 |
| Clifford C | 39 | July 23, 2003 | June 29, 2005 | July 27, 2005 |

| Name | Age | On or about 1st Office Visit | On or about Last Office Visit | On or about Date of Death |
|------|-----|------------------------------|-------------------------------|----------------------------|
| Sue B | 38 | Oct. 21, 2002 | May 12, 2005 | Aug. 1, 2005 |
| Jason P | 21 | Aug. 19, 2003 | June 29, 2005 | Sept. 4, 2005 |
| Randall S | 52 | April 27, 2005 | Nov. 12, 2005 | Nov. 19, 2005 |
| Thomas F | 46 | Feb. 15, 2005 | Jan. 5, 2006 | Jan. 9, 2006 |
| Toni W | 37 | Dec. 30, 1999 | Feb. 16, 2006 | Feb. 18, 2006 |
| Marilyn R | 39 | Aug. 16, 2004 | March 16, 2006 | April 5, 2006 |
| Dalene C | 45 | Aug. 25, 2003 | April 19, 2006 | April 21, 2006 |
| Eric T | 46 | June 2, 2003 | April 19, 2006 | April 23, 2006 |
| Jo Jo R | 46 | Feb. 26, 2005 | June 5, 2006 | June 7, 2006 |
| Mary Sue L | 55 | Jan. 30, 2002 | June 13, 2006 | June 14, 2006 |
| Pamela F | 42 | March 31, 2003 | July 21, 2006 | July 22, 2006 |
| Deborah W | 53 | July 18, 2003 | Sept. 7, 2006 | Sept. 9, 2006 |
| Jeffrey J | 39 | May 5, 2004 | Oct. 23, 2006 | Oct. 24, 2006 |
| Ronald W | 56 | June 29, 2004 | March 20, 2007 | March 23, 2007 |
| Evelyn S | 50 | Dec. 12, 2004 | April 16, 2007 | April 17, 2007 |
| Robin G | 45 | July 13, 2004 | May 11, 2007 | May 15, 2007 |
| Ralph S | 44 | Jan. 16, 2003 | May 15, 2007 | July 23, 2007 |
| Patsy W | 49 | Dec. 2, 1999 | July 16, 2007 | July 26, 2007 |
| Donna D | 48 | Dec. 27, 2005 | July 19, 2007 | Aug. 16, 2007 |
| Lucy S. | 61 | Aug. 29, 2003 | Aug. 23, 2007 | Aug. 28, 2007 |
| Gyna G | 33 | Feb. 10, 2004 | Oct. 4, 2007 | Oct. 7, 2007 |
| Casey G | 28 | Sept. 4, 2007 | Sept. 13, 2007 | Oct. 23, 2007 |
| Julia F | 50 | June 20, 2007 | Nov. 20, 2007 | Nov. 28, 2007 |
| Rebecca T | 54 | May 2, 2006 | Nov. 17, 2007 | Dec. 24, 2007 |
| Jane E | 40 | Jan. 8, 2003 | Jan. 12, 2008 | Jan. 26, 2008 |
| John D | 52 | June 23, 2003 | Jan. 3, 2008 | Feb. 10, 2008 |

(k)     Despite having notice of the overdoses and deaths outlined in paragraphs (i) and (j) over time from several sources, including the Sedgwick County Forensic Science Center, hospitals, law enforcement, obituaries, family members of the deceased, Clinic employees, insurance audits, and lawsuits, the defendants **STEPHEN J. SCHNEIDER and LINDA K. SCHNEIDER, a/k/a LINDA K. ATTERBURY** and others employed at the Schneider Medical Clinic failed to change their prescribing patterns and practices, with the consequence of such failure being continuing overdoses and overdose deaths.

(l)     From at least January 2002 through January 2008, defendants **STEPHEN J. SCHNEIDER and LINDA K. SCHNEIDER, a/k/a LINDA K. ATTERBURY** and others employed at the Schneider Medical Clinic directly caused the serious bodily injury and deaths of at least the following individuals: Patricia G, Robin G, Katherine S, and Eric T.

(m)    From at least January 2002 through January 2008, defendants **STEPHEN J. SCHNEIDER and LINDA K. SCHNEIDER, a/k/a LINDA K. ATTERBURY** and others employed at the Schneider Medical Clinic contributed to the serious bodily injury and deaths of at least the following individuals:  Kandace B, Dalene C, Terry C, Pamela F, Jeff H, Victor J, Jeffrey J, Mary Sue L, Heather M, Jo Jo R, Billie Jean R, Brad S, Evelyn S, Mary Jo S, Robert S, Patsy W, and Toni W.

(n)     From at least January 2002 through January 2008, defendants **STEPHEN J. SCHNEIDER and LINDA K. SCHNEIDER, a/k/a LINDA K. ATTERBURY** and others employed at the Schneider Medical Clinic illegally distributed controlled substances to at least the following individuals:  Earl A, Sue B, Boyce B, Michael C, Danny C, Leslie C, James C, Patricia C, Catherine D, Jessie D, Thomas F, Lacie F, Marie H, Russell H, Darrell H, Vickie H, Shannon Mi, Jerad M, Jason P, Mark P, Tori S, Jamie S, Randall S, Michelle S, Ancira W, Erika W, Ronald W.

(o)     During the existence of Schneider Medical Clinic, defendant **LINDA K. SCHNEIDER, a/k/a LINDA K. ATTERBURY** threatened employees who questioned her, her husband, and what occurred at the Clinic by claiming to have connections to the "Mexican Mafia".

(p)     During the existence of the Schneider Medical Clinic, defendant **LINDA K. SCHNEIDER, a/k/a LINDA K. ATTERBURY** forged defendant **STEPHEN J. SCHNEIDER'S** name on prescriptions.

52.     The foregoing is in violation of Title 18, United States Code, Sections 371 and 2, with reference to Title 18, United States Code, Section 1349.

**COUNT 2**
**UNLAWFUL DISTRIBUTION AND DISPENSING OF CONTROLLED**
**SUBSTANCES RESULTING IN SERIOUS BODILY INJURY AND DEATH**
**OF PATRICIA G**

53.     The Grand Jury incorporates Paragraphs 1 through 52 by reference as though fully realleged and restated herein.

54.     In early 2003, Patricia G moved from southern Missouri to Wichita, Kansas, to be married.  She had her first office visit at Schneider Medical Clinic on or about Saturday, February 1, 2003.  She did not ask for, and did not receive, any prescriptions for controlled drugs.

55.     In late April 2003, Patricia G was involved in a car accident, and was seen in the Wesley Hospital Emergency Room.  The ER physician gave her Hydrocodone (Lortab) for lower back and left wrist pain.  On April 30, 2003, she saw a physician at Schneider Medical Clinic, who prescribed additional Lortab, Flexoril (a muscle relaxant), and Vioxx (an anti-inflammatory).

56.     On May 13, 2003, Patricia G returned to the Clinic and received more Lortab, as well as Bextra (another anti-inflammatory).   On May 20, 2003, 7 days later, Patricia G returned to the Clinic and received prescriptions for more Lortab from defendant **STEPHEN J. SCHNEIDER**.

57.     Patricia G did not return to the Clinic until four months later, on September 18, 2003.  Billing information indicates that Patricia G was one of 61 patients defendant **STEPHEN J. SCHNEIDER** claims to have seen that day.  Patricia G complained of knee pain, and from this point forward, despite surgeries to relieve the cause of her knee pain,

33

Patricia G received a steady supply of controlled drugs, in escalating dosages and amounts, in varying combinations, and received numerous early refills.

58.     For the next 9 months, defendant **STEPHEN J. SCHNEIDER** and others continued to prescribe controlled drugs to Patricia G, despite her reports of increasing pain, despite her exhibiting signs of depression, and despite her exhibiting signs of abuse and addiction.

59.     On June 16, 2005, Patricia G was admitted to Via Christi Medical Center for a suspected overdose of prescription drugs.  On June 17, 2005, at 10:00 p.m., the Clinic received her History and Physical from Via Christi Medical Center, which indicated a possible drug overdose.

60.     On Saturday, June 18, 2005, Patricia G came to the Clinic as a walk-in.  A Physician's Assistant continued the prescriptions defendant **STEPHEN J. SCHNEIDER** issued one month before, namely 180 Lortab 10/500 mg. (Hydrocodone), 60 Oxycontin 20 mg. (Oxycodone), and 30 Xanax 2 mg. (a Benzodiazepine).  The Physician's Assistant noted in Patricia's chart that consideration should be given to decreasing her medications.  Defendant **STEPHEN J. SCHNEIDER** countersigned the June 18th progress note, indicating he had read it and approved the treatment decision.

61.     On June 20, 2005, just two days after her last office visit at Schneider Medical Clinic, Patricia G died of an accidental overdose of prescription drugs, including Hydrocodone, Oxycodone, and Benzodiazepines.  She was 49 years old.

62.     Prior to Patricia's death, at least 36 other Clinic patients had died of drug overdoses.

34

63.     From on or about February 1, 2003, and continuing through on or about June 18, 2005, in the District of Kansas, the defendants,

**STEPHEN J. SCHNEIDER**
**and**
**LINDA K. SCHNEIDER**
**a/k/a LINDA K. ATTERBURY,**

not for a legitimate medical purpose and outside the usual course of professional medical practice, did knowingly and intentionally distribute and dispense, and caused to be distributed and dispensed, to Patricia G at least the following controlled substances, resulting in Patricia G's serious bodily injury and death:

| Schedule | Controlled Substance |
|----------|----------------------|
| 2 | **Morphine**<br>**Oxycodone** |
| 3 | **Hydrocodone/APAP** |
| 4 | **Alprazolam (Xanax)**<br>**Clonazepam** |

64.     The foregoing is in violation of Title 21, United States Code, Sections 841(a)(1), and Title 18, United States Code, Section 2, with reference to Title 21, United States Code, Sections 841(b)(1)(C), 841(b)(1)(D), 841(b)(2).

**COUNT 3**
**UNLAWFUL DISTRIBUTION AND DISPENSING OF CONTROLLED**
**SUBSTANCES RESULTING IN SERIOUS BODILY INJURY AND DEATH**
**OF ERIC T**

65.     The Grand Jury incorporates Paragraphs 1 through 52 by reference as though fully realleged and restated herein.

66.     In approximately 1994, Eric T suffered a serious back injury in a car accident.  His first visit to the Schneider Medical Clinic was March 14, 2003.  At that

35

initial office visit, defendant **STEPHEN J. SCHNEIDER** failed to obtain a sufficient

medical history, failed to perform a sufficient physical examination, and failed to perform

a neurological examination, but diagnosed Eric T with degenerative disk disease of the

lower spine and chronic pain, and prescribed him 100 Lortab 10/500 mg. (Hydrocodone),

and 40 Soma (muscle relaxant).

67.     For the next 3 years, defendant **STEPHEN J. SCHNEIDER** and other

Clinic providers treated Eric T with escalating dosages and amounts of controlled drugs,

as well as combinations of controlled drugs, despite signs of abuse and addiction

(including early visits for refills and failed urine drug screens), and despite no

improvement in Eric T's pain.

68.     On April 19, 2006, a Physician's Assistant followed defendant **STEPHEN J.**

**SCHNEIDER's** previous prescribing pattern for Eric T and wrote the following

prescriptions for him: 180 Lortab 10/500 mg. (Hydrocodone); 30 Oxycodone/APAP

10/650 mg. (Percocet); 90 Methadose 40 mg. (Methadone); and 30 Carisoprodol 350

mg. (Soma).

69.     On April 23, 2006, just 4 days after his last office visit at Schneider Medical

Clinic, Eric T died of an accidental overdose of the drugs he was prescribed on April 19,

2006, namely, Hydrocodone, Oxycodone, Methadone, and Carisoprodol.  He was 46

years old.

70.     Prior to Eric's death, at least 49 other Clinic patients had died of drug

overdoses, including a patient who died two days before, on April 21, 2006.

71.     From on or about March 14, 2003, and continuing through on or about April

19, 2006, in the District of Kansas, the defendants,

36

**STEPHEN J. SCHNEIDER**
**and**
**LINDA K. SCHNEIDER**
**a/k/a LINDA K. ATTERBURY,**

not for a legitimate medical purpose and outside the usual course of professional

medical practice, did knowingly and intentionally distribute and dispense, and caused to

be distributed and dispensed, to Eric T at least the following controlled substances,

resulting in Eric T's serious bodily injury and death:

| Schedule | Controlled Substance |
|----------|----------------------|
| 2 | **Fentanyl**<br>**Methadone**<br>**Oxycodone** |
| 3 | **Hydrocodone/APAP** |
| 4 | **Diazepam (Valium)**<br>**Sonata** |

72.     The foregoing is in violation of Title 21, United States Code, Sections

841(a)(1), and Title 18, United States Code, Section 2, with reference to Title 21, United

States Code, Sections 841(b)(1)(C), 841(b)(1)(D), 841(b)(2).

**COUNT 4**
**UNLAWFUL DISTRIBUTION AND DISPENSING OF CONTROLLED**
**SUBSTANCES RESULTING IN SERIOUS BODILY INJURY AND DEATH**
**OF ROBIN G**

73.     The Grand Jury incorporates Paragraphs 1 through 52 by reference as

though fully realleged and restated herein.

74.     Robin G suffered from migraine headaches.  Her first office visit at

Schneider Medical Clinic occurred on July 13, 2004, where she reported that she had

headaches 2-3 times per month.  Defendant **STEPHEN J. SCHNEIDER** performed a

minimal physical examination, obtained minimal historical information, requested no prior

37

medical records, studies, or laboratory tests, and made no attempt to verify Robin's past medical treatment.  He prescribed her 2 boxes, or 60, Actiq 400 mcg. "suckers" (Fentanyl); and 30 Avinza 30 mg. (Morphine).

75.     For almost 3 years, defendant **STEPHEN J. SCHNEIDER** and other Clinic providers prescribed Robin G increasing dosages and amounts of Actiq and Avinza, along with a benzodiazepine (Valium/Diazepam), despite signs of abuse and addiction, including early refills.  The last prescription defendant **STEPHEN J. SCHNEIDER** wrote for Robin G on May 11, 2007, was for 120 suckers or lozenges of Fentanyl Citrate, 800 mcg, enough for 3,200 mcg. of Fentanyl per day for 30 days.  Additionally, defendant **STEPHEN J. SCHNEIDER** issued her a prescription for 120 Valium 10 mg. (a benzodiazepine) and for Lidoderm Patches (a transdermally delivered form of Lidocaine, an anesthetic).

76.     On May 15, 2007, just 4 days after her last office visit at Schneider Medical Clinic, Robin died of Fentanyl intoxication.  She was 45 years old.

77.     Prior to Robin's death, at least 57 other Clinic patients had died of drug overdoses.

78.     From on or about July 13, 2004, and continuing through on or about May 11, 2007, in the District of Kansas, the defendants,

**STEPHEN J. SCHNEIDER**
**and**
**LINDA K. SCHNEIDER**
**a/k/a LINDA K. ATTERBURY,**

not for a legitimate medical purpose and outside the usual course of professional medical practice, did knowingly and intentionally distribute and dispense, and caused to

38

be distributed and dispensed, to Robin G at least the following controlled substances,

resulting in Robin G's serious bodily injury and death:

| Schedule | Controlled Substance |
|----------|----------------------|
| 2 | **Fentanyl (Actiq)** **Morphine** |
| 4 | **Diazepam (Valium)** **Klonopin** |

79.     The foregoing is in violation of Title 21, United States Code, Sections

841(a)(1), and Title 18, United States Code, Section 2, with reference to Title 21, United

States Code, Sections 841(b)(1)(C), 841(b)(2).

## COUNT 5
## UNLAWFUL DISTRIBUTION AND DISPENSING OF CONTROLLED SUBSTANCES, RESULTING IN SERIOUS BODILY INJURY AND DEATH

80.     The Grand Jury incorporates Paragraphs 1 through 52 by reference as

though fully realleged and restated herein.

81.     From in or about January 2002, and continuing through in or about July

2007, within the District of Kansas, in furtherance of their conspiracy and scheme, the

defendants

**STEPHEN J. SCHNEIDER**
**and**
**LINDA K. SCHNEIDER**
**a/k/a LINDA K. ATTERBURY**,

not for a legitimate medical purpose and outside the usual course of professional

medical practice, did knowingly and intentionally distribute and dispense, and caused to

be distributed and dispensed, Schedule 2, 3 and 4 controlled substances to at least the

below-listed individuals, which resulted in their serious bodily injuries and deaths:

39

| Name | Age at Death |
|------|------|
| Kandace B | 43 |
| Dalene C | 45 |
| Terry C | 48 |
| Pamela F | 42 |
| Jeff H | 45 |
| Victor J | 48 |
| Jeffrey J | 40 |
| Mary Sue L | 55 |
| Heather M | 28 |
| Jo Jo R | 46 |
| Billy R | 45 |
| Brad S | 53 |
| Katherine S | 46 |
| Evelyn S | 50 |
| Mary Jo S | 52 |
| Robert S | 31 |
| Patsy W | 50 |
| Toni W | 37 |

82.     The foregoing is in violation of Title 21, United States Code, Sections

841(a)(1), and Title 18, United States Code, Section 2, with reference to Title 21, United

States Code, Sections 841(b)(1)(C), 841(b)(1)(D), 841(b)(2).

**COUNT 6**
**UNLAWFUL DISTRIBUTION AND DISPENSING OF**
**CONTROLLED SUBSTANCES**

83.     The Grand Jury incorporates Paragraphs 1 through 52 by reference as
though fully realleged and restated herein.

84.     From in or about January 2002, and continuing through at least in or about
January 2008, within the District of Kansas, in furtherance of their conspiracy and
scheme, the defendants,

**STEPHEN J. SCHNEIDER**
**and**
**LINDA K. SCHNEIDER**
**a/k/a LINDA K. ATTERBURY**,

not for a legitimate medical purpose and outside the usual course of professional
medical practice, did knowingly and intentionally distribute and dispense, and caused to
be distributed and dispensed, Schedule 2, 3 and 4 controlled substances to at least the
27 below-listed individuals, including three identified minors.  Of the 27 below-listed
individuals, 19 eventually died of drug overdoses:

| Name | Date of Death | Age at Death |
|------|---------------|--------------|
| Earl A | July 3, 2005 | 29 |
| Sue B | Aug. 1, 2005 | 38 |
| Boyce B | July 25, 2003 | 59 |
| Michael C (minor) | | |
| Danny C | March 6, 2004 | 35 |
| Leslie C | Feb. 14, 2003 | 49 |
| James C | June 9, 2004 | 33 |
| Patricia C | Oct. 6, 2004 | 43 |
| Catherine D | | |

41

| Name | Date of Death | Age at Death |
|------|---------------|--------------|
| Jessie D | July 11, 2003 | 21 |
| Thomas F | Jan. 9, 2006 | 46 |
| Lacie F (minor) | | |
| Marie H | June 30, 2003 | 43 |
| Russell H | Jan. 19, 2005 | 24 |
| Darrell H | July 17, 2004 | 24 |
| Vickie H | April 11, 2004 | 53 |
| Shannon Mi | Feb. 23, 2004 | 38 |
| Jerad M | June 21, 2005 | 24 |
| Jason P | Sept. 4, 2005 | 21 |
| Mark P | | |
| Tori S (minor) | | |
| Jamie S | | |
| Randall S | Nov. 19, 2005 | 52 |
| Michelle S | | |
| Ancira W | July 12, 2004 | 45 |
| Erika W | | |
| Ronald W | March 23, 2007 | 56 |

85.    The foregoing is in violation of Title 21, United States Code, Section

841(a)(1), and Title 18, United States Code, Section 2, with reference to Title 21, United

States Code, Sections 841(b)(1)(C), 841(b)(1)(D), 841(b)(2), 859.

**COUNTS 7-17**
**HEALTH CARE FRAUD**

86.     The Grand Jury incorporates Paragraphs 1 through 85 by reference as though fully realleged and restated herein.

87.     A Health Care Benefit Program is any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual.  Essentially, a Health Care Benefit Program is a public or private insurance company that processes and pays claims for medical services, including, for example, Medicare, Medicaid, Blue Cross/Blue Shield, and Preferred Health Systems.

88.     For the period October 2002 through December 31, 2006, the Clinic billed Health Care Benefit Programs for over 10,400 unique patients, over half of which were "Pain Management" patients, that is, patients receiving controlled drugs for what the Clinic represented were chronic pain conditions.  Of the over 10,400 unique patients, approximately 45% were insured by Medicaid and First Guard, Medicaid's Health Maintenance Organization ("HMO"); and approximately 60% of the "Pain Management" patients were so insured.

89.     Reimbursement requests for medical services are made by submitting a claim to a Health Care Benefit Program.  Each claim submitted for reimbursement requires the diagnosis, date of service, procedure code, type of service(s) provided, charges, and the name of the person providing the service(s).  The Health Care Benefit Programs process the claims and issue payments to the provider for covered services, that is, services that are medical services and that are medically necessary.

90.     Some Health Care Benefit Programs pay for prescription drugs.  But, to be eligible for reimbursement, the prescription must be issued for a legitimate medical purpose and within the usual course of professional medical practice.

91.     Health Care Benefit Programs are allowed to review documentation in a patient's file concerning the services provided to an insured patient.  The Programs require providers to keep written medical records which accurately and truthfully describe patient histories, pertinent findings, examination results, test results, and bona fide recommendations for services to be rendered to the patient.  These written medical records serve as documentary support for the claims submitted.

92.     Additionally, the State of Kansas, where the defendant **STEPHEN J. SCHNEIDER** is licensed to practice medicine, requires physicians to keep written medical records which accurately and truthfully describe the services rendered to the patient, including patient histories, pertinent findings, examination results, and test results.

93.     It is a well-established principle in the health care industry that if a service is not documented, it did not happen, and is therefore not reimbursable.  Additionally, documentation must be clearly legible.  If the document ostensibly supporting a service is not legible, Health Care Benefit Programs can deny reimbursement for the service.

94.     In requesting payment from Health Care Benefit Programs, providers utilize a coding system found in the physicians' Current Procedural Terminology, commonly known as the CPT Code Book, which contains a listing of descriptive terms and identifying code numbers for the standardized reporting of approximately 7,500 medical services and procedures.  The purpose of the CPT Code Book is to provide a uniform

44

language that accurately describes medical, surgical, and diagnostic services to facilitate

nationwide communications among health care workers, patients and others.  CPT

codes are used by Health Care Benefit Programs for tracking and processing claims.


95.    The Clinic billed Health Care Benefit Programs using a variety of CPT

codes, but primarily billed for one code, an intermediate office visit code for established

patients, known as a 99213.  The CPT Code Book describes such an office visit as

follows:

> Office or other outpatient visit for the evaluation and management of an
> established patient, which requires at least two of these three key components:
> (1) An expanded problem focused history; (2) an expanded problem focused
> examination; (3) medical decision making of low complexity.  Usually, the
> presenting problem(s) are of low to moderate severity.  Physicians typically spend
> 15 minutes face-to-face with the patient and/or family.

96.    The Health Care Benefit Programs typically pay a lower rate for Physician's

Assistants' services than they pay for a physician's services.  For example:

Medicaid pays 75% of what it would pay a physician; Blue Cross/Blue Shield of Kansas

and Preferred Health Systems pay 85%; and Medicare pays the same as it would pay a

physician, provided the physician is present in the Clinic when the Physician Assistant

renders the services; otherwise, Medicare pays 85% of what it would pay a physician.

**COUNT 7**
**HEALTH CARE FRAUD RESULTING IN SERIOUS BODILY INJURY AND DEATH**
**OF PATRICIA G**

97.     The Grand Jury incorporates Paragraphs 1 through 64, and 87 through 96, by reference as though fully realleged and restated herein.

98.     From on or about February 1, 2003, and continuing through on or about June 18, 2005, defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** submitted claims for ostensibly providing 37 office visits to Patricia G.  Of those 37 office visits, 32 were billed as CPT Code 99213, and 25 office visits were billed as though defendant **STEPHEN J. SCHNEIDER** provided the services.

99.     On 13 days, Patricia G was one of 50 or more patients to whom defendant **STEPHEN J. SCHNEIDER** ostensibly provided services.  On Monday, November 29, 2004, she was one of 108 patients at the Clinic for whom defendant **STEPHEN J. SCHNEIDER** billed for providing services, in addition to 9 patients at a nursing home for whom he billed for providing services.

100.    Of the 37 office visits for which the defendants submitted claims:

(a)     the provider was upcoded from a Physician's Assistant to a physician on at least 9 claims;

(b)     the level of service was upcoded on at least 27 claims, and as many as 36 claims, depending on whether the "checklist" on the progress note is considered as sufficient documentation; and

(c)     only 2 progress notes were clearly legible.

101.    From on or about February 1, 2003, and continuing through on or about June 18, 2005, in the District of Kansas, for the purpose of executing the above-

described conspiracy and scheme to defraud Health Care Benefit Programs and patients

in connection with the delivery of and payment of health care benefits, items, and

services, and attempting to do so, defendants

**STEPHEN J. SCHNEIDER**
**and**
**LINDA K. SCHNEIDER**
**a/k/a LINDA K. ATTERBURY**

defrauded Health Care Benefit Programs of money, and defrauded Patricia G of money,

by knowingly and willfully submitting and causing to be submitted to Blue Cross/Blue

Shield of Kansas and Preferred Health Systems materially false and fraudulent claims for

medical services and prescriptions ostensibly provided to Patricia G, when in truth and in

fact, the services were not legitimate medical services and the prescriptions were issued

neither for a legitimate medical purpose nor within the course of usual medical practice,

resulting in Patricia G's serious bodily injury and death, and the claims were additionally

materially false and fraudulent because they were upcoded and not supported by

appropriate documentation.

102.    The foregoing is in violation of Title 18, United States Code, Sections 1347

and 2.

## COUNT 8
## HEALTH CARE FRAUD RESULTING IN SERIOUS BODILY INJURY AND DEATH
## OF ERIC T

103.    The Grand Jury incorporates Paragraphs 1 through 52 , 66 through 72, and

87 through 96, by reference as though fully realleged and restated herein.

104.    From on or about March 14, 2003, and continuing through on or about April

19, 2006, defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** submitted

claims for 46 office visits ostensibly provided to Eric T.  Of those 46 office visits, all were

billed as CPT Code 99213, and 21 office visits were billed as though defendant

**STEPHEN J. SCHNEIDER** provided the services.

105.    On 16 days, Eric T was one of 50 or more patients defendant **STEPHEN J.**

**SCHNEIDER** ostensibly saw.  On Thursday, March 31, 2005, he was one of

58 patients at the Clinic for whom defendant **STEPHEN J. SCHNEIDER** billed for

providing services, in addition to 8 patients at a nursing home for whom he billed for

providing services.

106.    Of the 46 office visits for which the defendants submitted claims:

(a)     the provider was upcoded from a Physician's Assistant to a physician on at

least 18 claims;

(b)     the level of service was upcoded on at least 30 claims, and as many as 44

claims, depending on whether the "checklist" on the progress note is

considered as sufficient documentation; and

(c)     only 9 progress notes were clearly legible.

107.    From on or about March 14, 2003, and continuing through on or about April

19, 2006, in the District of Kansas, for the purpose of executing the above-described

conspiracy and scheme to defraud Health Care Benefit Programs and patients in

connection with the delivery of and payment of health care benefits, items, and services,

and attempting to do so, defendants

**STEPHEN J. SCHNEIDER**
**and**
**LINDA K. SCHNEIDER**
**a/k/a LINDA K. ATTERBURY**

48

defrauded Health Care Benefit Programs of money, and Eric T of money, by knowingly

and willfully submitting and causing to be submitted to UHC Benesight, Preferred Health

Systems, Caremark, and Advance PCS materially false and fraudulent claims for

medical services and prescriptions ostensibly provided to Eric T, when in truth and in

fact, the services were not legitimate medical services and the prescriptions were neither

for a legitimate medical purpose nor within the course of usual medical practice, resulting

in Eric T's serious bodily injury and death, and the claims were additionally materially

false and fraudulent because they were upcoded and not supported by appropriate

documentation.

108.    The foregoing is in violation of Title 18, United States Code, Sections 1347

and 2.

## COUNT 9
## HEALTH CARE FRAUD RESULTING IN SERIOUS BODILY INJURY AND DEATH
## OF ROBIN G

109.    The Grand Jury incorporates Paragraphs 1 through 52, 74 through 79, and

87 through 96, by reference as though fully realleged and restated herein.

110.    From on or about July 13, 2004, and continuing through on or about May

11, 2007, defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** submitted

claims for ostensibly providing Robin G 40 office visits.  Of those 40 office visits, 32 were

billed as CPT Code 99213, and 25 office visits were billed as though defendant

**STEPHEN J. SCHNEIDER** provided the services.

111.    On 11 days, Robin G was one of 50 or more patients defendant **STEPHEN**

**J. SCHNEIDER** ostensibly saw.  On Thursday, May 5, 2005, she was one of 64 patients

49

at the Clinic for whom defendant **STEPHEN J. SCHNEIDER** billed for providing services, in addition to 9 patients at a nursing home for whom he billed for providing services.

112.    Of the 40 office visits for which the defendants submitted claims:

(a)     the provider was upcoded from a Physician's Assistant to a physician on at least 4 claims;

(b)     the level of service was upcoded on at least 25 claims, and as many as 33 claims, depending on whether the "checklist" on the progress note is considered as sufficient documentation; and

(c)     only 17 progress notes were clearly legible.

113.    From on or about July 13, 2004, and continuing through on or about May 11, 2007, in the District of Kansas, for the purpose of executing the above-described conspiracy and scheme to defraud Health Care Benefit Programs and patients in connection with the delivery of and payment of health care benefits, items, and services, and attempting to do so, defendants

**STEPHEN J. SCHNEIDER**
**and**
**LINDA K. SCHNEIDER**
**a/k/a LINDA K. ATTERBURY**

defrauded Health Care Benefit Programs of money, and Robin G of money, by knowingly and willfully submitting and causing to be submitted to Blue Cross/Blue Shield of Kansas and Blue Cross/Blue Shield of Texas materially false and fraudulent claims for medical services and prescriptions ostensibly provided to Robin G, when in truth and in fact, the services were not legitimate medical services and the prescriptions were issued neither for a legitimate medical purpose nor within the course of usual medical practice, resulting

in Robin G's serious bodily injury and death, and the claims were additionally materially false and fraudulent because they were upcoded and not supported by appropriate documentation.

114.    The foregoing is in violation of Title 18, United States Code, Sections 1347 and 2.

## COUNTS 10-12
## HEALTH CARE FRAUD – ACTIQ PRESCRIPTIONS

115.    The Grand Jury incorporates Paragraphs 1 through 114, by reference as though fully realleged and restated herein.

116.    Fentanyl is a highly potent form of synthetic (man-made) opiate, more powerful than heroin.  Actiq is Fentanyl in "sucker" or lozenge form.  The FDA-approved use for Actiq is for patients with end-of-life, "break through" cancer pain.  Defendant **STEPHEN J. SCHNEIDER** and other Clinic providers prescribed Actiq for off-label uses, including for the treatment of general pain and migraines.  Additionally, defendant **STEPHEN J. SCHNEIDER** and other Clinic providers prescribed Actiq to minors.

117.    During a 2004 First Guard audit of the Clinic's quality of care, First Guard's medical reviewers questioned defendant **STEPHEN J. SCHNEIDER**'s and other Clinic providers' Actiq prescriptions.  On or about January 4, 2005, defendant **STEPHEN J. SCHNEIDER** agreed that the Clinic's providers would no longer prescribe Actiq off-label to individuals insured by First Guard.  Thereafter, although defendant **STEPHEN J. SCHNEIDER** did not prescribe Actiq off-label for First Guard patients, he continued to prescribe Actiq off-label to other patients.

118.   From in or about 2003 and continuing through in or about 2007, defendant **STEPHEN J. SCHNEIDER** and other Clinic providers prescribed Actiq for over 70 patients who did not have cancer.  Of those patients, Clinic progress notes indicate that over 50 patients showed signs of drug-seeking behavior and/or addiction while being prescribed Actiq.  Defendant **STEPHEN J. SCHNEIDER** and other Clinic providers continued to prescribe Actiq to patients who overdosed on the Actiq or on other prescribed medications.

119.   From on or about March 26, 2003, and continuing through at least on or about May 15, 2007, within the District of Kansas, in furtherance of their scheme and conspiracy, the defendants, **STEPHEN J. SCHNEIDER and LINDA K. SCHNEIDER a/k/a LINDA K. ATTERBURY**, not for a legitimate medical purpose and outside the usual course of professional medical practice, did knowingly and intentionally distribute and dispense, and caused to be distributed and dispensed, to at least the below-listed individuals, ostensibly for the indicated ailments, Actiq (Fentanyl), a Schedule 2 controlled substance:

| Individual | Age at First Rx | Ostensibly Being Treated for |
|---|---|---|
| Stephanie A | 30 | Migraine |
| Candice A | 41 | Hip pain |
| Kyla B | 33 | Migraine |
| Katrina B | 23 | Migraine |
| Joshua B | 27 | Lower back pain |
| Sharon B | 35 | Migraine |
| James B | 49 | Leg and back pain |
| Allan C | 42 | Chronic foot pain |

| Individual | Age at First Rx | Ostensibly Being Treated for |
|---|---|---|
| Christina C | 44 | Migraine, chronic back pain |
| Michael C | 16 | Migraine |
| Gary C | 34 | Lower back pain |
| Mark C | 43 | Degenerative disk disease |
| Brandi D | 41 | Shoulder pain |
| Tiffany D | 34 | Neck and shoulder pain |
| Elizabeth E | 40 | Knee pain, migraine |
| Jane E | 37 | Headache |
| Lacie F | 20 | Migraine |
| Carol G | 41 | Lower back pain |
| Janet H | 56 | Rheumatoid arthritis |
| Catherine H | 42 | Knee and menstrual pain |
| Gayla H | 46 | Rib injury |
| Mark L | 45 | Lower back pain, degenerative disk disease |
| Jamie M | 33 | Degenerative disk disease |
| Brandy M | 22 | Chronic back pain |
| Lynn M | 39 | Chronic ankle pain |
| Becky P | 41 | Migraine |
| Cherie R | 37 | Headache |
| Neil S | 30 | Chron's disease |
| Jessica S | 25 | Back pain, headache |
| Tori S | 15 | Migraine |
| Douglas S | 37 | Migraine |
| Jaime S | 25 | Migraine |
| Lorene T | 53 | Lower back pain, chronic headache |
| Della T | 39 | Chronic migraine |
| Sasha V | 21 | Cysts on sinus |
| Ericka W | 24 | Migraine, lower back pain |

| Individual | Age at First Rx | Ostensibly Being Treated for |
|------------|-----------------|------------------------------|
| Andrew Z   | 24              | Chronic back pain            |

120.    Between on or about March 26, 2003, and continuing through at least on or about May 15, 2007, in the District of Kansas, for the purpose of executing the above-described scheme to defraud Health Care Benefit Programs and patients in connection with the delivery of and payment of health care benefits, items, and services, and attempting to do so, defendants

**STEPHEN J. SCHNEIDER**
**and**
**LINDA K. SCHNEIDER**
**a/k/a LINDA K. ATTERBURY,**

knowingly and willfully caused to be submitted materially false and fraudulent claims for Actiq (Fentanyl), which the defendants illegally distributed and dispensed, and caused to be distributed and dispensed, to at least the individuals identified above, and for which at least the below-identified Health Care Benefit Programs made at least the approximate indicated payments:

| Count | Health Care Benefit Program | Amount Paid |
|-------|-----------------------------|-------------|
| 10    | Medicaid                    | $381,632.51 |
| 11    | First Guard                 | $49,176.79  |
| 12    | Blue Cross/Blue Shield of Kansas | $92,148.74 |
| **Total** |                         | **$522,958.04** |

121.    The foregoing is in violation of Title 18, United States Code, Sections 1347 and 2.

## COUNTS 13-17
## HEALTH CARE FRAUD – SERVICES

122.    The Grand Jury incorporates Paragraphs 1 through 121 by reference as though fully realleged and restated herein.

123.    From in or about October 2002, and continuing through at least in or about May 2007, defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER**, through Schneider Medical Clinic, submitted and received payment for materially false and fraudulent claims to numerous Health Care Benefit Programs, including Medicaid, Medicare, Blue Cross/Blue Shield of Kansas, and Preferred Health Systems.

124.    The Clinic was permeated by fraud, and the claims the defendants submitted and received payment for were materially false and fraudulent in one or more of the following respects:

(a)    defendants made claims for services not rendered, including:

(1)    office visits billed by providers who were out of town;

(2)    office visits billed by providers who were not present at the Clinic, including office visits on weekends; and

(3)    office visits that were not for a legitimate medical purpose or within the course of usual medical practice;

(b)    defendants upcoded office visits, that is, they made claims for an office visit at a higher code than the service provided;

(c)    defendants made claims for office visits as though a physician saw the patient, when in fact, a Physician's Assistant saw the patient; and

(d)     defendants made claims for services not sufficiently documented in the patient's medical record.

125.    Between on or about October 1, 2002, and continuing through on or about December 31, 2006, the following five Health Care Benefit Programs paid the following approximate amounts to Schneider Medical Clinic for claims for services ostensibly provided at the Clinic:

| Health Care Benefit Program | Amount Paid to Clinic |
|---|---|
| Medicaid | $659,777.68 |
| Medicaid HMO – First Guard | $583,579.83 |
| Medicare | $707,684.45 |
| Blue Cross/Blue Shield of Kansas | $951,022.33 |
| Preferred Health Systems | $772,451.45 |
| **Total** | **$3,674,515.74** |

126.    Medicaid, Medicare, Blue Cross/Blue Shield of Kansas, and Preferred Health Systems reviewed statistically valid random samples of Clinic patient files to determine if the office visits had been correctly billed.  Those reviews concluded that as many as 53% of the claims submitted were materially false and fraudulent because the provider had been upcoded from a Physician's Assistant to a physician; and as many as 70% of the claims submitted were materially false and fraudulent because the services had been upcoded from a lesser service to a higher-reimbursing service.

127.    A Doctor of Osteopathy, who is also a Certified Coder, who operates a Family Practice and specializes in Pain Management, reviewed over 1250 claims and the supporting documents for 54 of the 76 individuals named in Counts 2 through 9, and concluded that approximately 30% of the claims submitted were materially false and

fraudulent because the provider had been upcoded from a Physician's Assistant to a physician; as many as 93% of the claims submitted were materially false and fraudulent because the services had been upcoded from a lesser service to a higher-reimbursing service; and approximately 42% of the documentation was not legible.

128.   On or about November 15, 2006, Blue Cross/Blue Shield of Kansas placed the Clinic's claims on pre-payment review.  For the first 6 months of that review, Blue Cross/Blue Shield downcoded (that is, reduced reimbursement for) the vast majority of the paid claims, based on the documentation the defendants submitted in support of the claims.

129.   From on or about October 1, 2002, and continuing through at least on or about December 31, 2006, in the District of Kansas, for the purpose of executing the above-described scheme to defraud Health Care Benefit Programs in connection with the delivery of and payment of health care benefits, items, and services, and attempting to do so, defendants,

**STEPHEN J. SCHNEIDER**
**and**
**LINDA K. SCHNEIDER**
**a/k/a LINDA K. ATTERBURY**,

knowingly and willfully submitted and caused to be submitted at least the following number of materially false and fraudulent claims to the identified Health Care Benefit Program for office visit services ostensibly provided to Schneider Medical Clinic patients, resulting in the Clinic receiving money to which it was not entitled:

57

| Count | Program | Number and Type of Materially False and Fraudulent Claims |
|-------|---------|-----------------------------------------------------------|
| 13 | Medicaid | Of **1094** claims reviewed, the claims were materially false and fraudulent in one or more of the following respects:<br><br>-- **328** were billed as though a physician provided the services, when a physician's assistant provided the services;<br>-- **216** were billed at a higher level of service than the documentation supported, with the checklist taken into account;<br>-- **288** were billed at a higher level of service than the documentation supported, with the checklist not taken into account. |
| 14 | First Guard | Of **626** claims reviewed, the claims were materially false and fraudulent in one or more of the following respects:<br><br>-- **330** were billed as though a physician provided the services, when a physician's assistant provided the services;<br>-- **135** were billed at a higher level of service than the documentation supported, with the checklist taken into account;<br>-- **203** were billed at a higher level of service than the documentation supported, with the checklist not taken into account. |
| 15 | Medicare | Of **482** claims reviewed, the claims were materially false and fraudulent in one or more of the following respects:<br><br>-- **180** were billed as though a physician provided the services, when a physician's assistant provided the services;<br>-- **200** were billed at a higher level of service than the documentation supported, with the checklist taken into account;<br>-- **314** were billed at a higher level of service than the documentation supported, with the checklist not taken into account. |

| Count | Program | Number and Type of Materially False and Fraudulent Claims |
|-------|---------|-----------------------------------------------------------|
| 16 | Blue Cross/Blue Shield of Kansas | Of **692** claims reviewed, the claims were materially false and fraudulent in one or more of the following respects:<br><br>-- **229** were billed as though a physician provided the services, when a physician's assistant provided the services;<br>-- **409** were billed at a higher level of service than the documentation supported, with the checklist taken into account;<br>-- **482** were billed at a higher level of service than the documentation supported, with the checklist not taken into account. |
| 17 | Preferred Health Systems | Of **591** claims reviewed, the claims were materially false and fraudulent in one or more of the following respects:<br><br>-- **233** were billed as though a physician provided the services, when a physician's assistant provided the services;<br>-- **276** were billed at a higher level of service than the documentation supported, with the checklist taken into account;<br>-- **374** were billed at a higher level of service than the documentation supported, with the checklist not taken into account. |

130.    The foregoing is in violation of Title 18, United States Code, Sections 1347 and 2.

## COUNTS 18-34
## ILLEGAL MONETARY TRANSACTIONS

131.    The Grand Jury incorporates Paragraphs 1 through 130 by reference as though fully realleged and restated herein.

132.    Defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER** utilized the following federally insured financial institutions and accounts to conduct financial transactions:

59

(a)     Valley State Bank Account Number XXX571, in the name of Schneider

          Medical Clinic, L.L.C.;

(b)     Valley State Bank Account Number XXX012, in the name of Schneider

          Medical Properties, L.L.C.;

(c)     Credit Union of America Account Number XXX131, in the names of Lee E.

          Atterbury and Ellen M. Atterbury;

(d)     Credit Union of America Account Number XXX678, in the names of Linda

          K. Atterbury, Stephen J. Schneider, Zoyie Schneider, and Jena Schneider;

(e)     Bank of America Account Number XXXX-XXXX-0429, in the names of

          Stephen J. Schneider, O.D., or Linda Atterbury Schneider;

(f)     Intrust Bank Account Number XXX8364, in the names of Zoyie Schneider

          and Linda Atterbury Schneider;

(g)     Intrust Bank Account Number XXXXXX2025, in the names of Stephen

          Schneider and Linda Atterbury Schneider; and

(h)     Bancomer Bank Account Number XXXXXX6336, in the name of Linda K.

          Atterbury.

133.   On or about the following dates, in the District of Kansas, the defendants,

**STEPHEN J. SCHNEIDER
and
LINDA K. SCHNEIDER
a/k/a LINDA K. ATTERBURY**

knowingly engaged, attempted to engage, and caused each other and others to engage,

in a monetary transaction affecting interstate commerce, in criminally derived property of

a value greater than $10,000, that is, the withdrawal, deposit, and transfer of funds from

and to the financial institutions identified below, such property having been derived from specified unlawful activity, that is unlawful distribution and dispensing of controlled substances, health care fraud, and conspiracy to unlawfully distribute and dispense controlled substances and to commit health care fraud, as alleged in Counts 1 through 17:

| Count | On or About Date | Monetary Transaction | Amount |
|-------|------------------|----------------------|--------|
| 18 | March 17, 2004 | Bank Money Order No. 115774 issued, payable to Linda Atterbury, funded by Valley State Bank Account No. XXX571 (Schneider Medical Clinic) | $50,000.00 |
| 19 | April 12, 2004 | Deposit of Bank Money Order No. 115774 to Credit Union of America Account No. XXX678 (Atterbury/Schneider) | $50,000.00 |
| 20 | April 27, 2004 | Bank Check No. 902458 issued, payable to Linda K. Atterbury, funded by Credit Union of America Account No. XXX678 (Atterbury/ Schneider) | $50,000.00 |
| 21 | April 28, 2004 | Deposit of Check No. 902458 into Intrust Bank Account No. XXX8364 (Zoyie & Linda Schneider) | $50,000.00 |
| 22 | April 28, 2004 | Withdrawal from Intrust Bank Account No. XXX8364 (Zoyie & Linda Schneider) to fund Check No. 499955637, payable to Sara Levin de Gonzalez | $60,000.00 |
| 23 | April 29, 2004 | Valley State Bank Installment Loan No. 7741402, used to fund Bank Money Order No. 116159, payable to Linda Atterbury Schneider or Stephen Schneider | $70,000.00 |
| 24 | April 29, 2004 | Purchase of Intrust Bank Check No. 499955644, payable to Sara De Levin Gonzalez, funded by Bank Money Order No. 116159 | $70,000.00 |
| 25 | May 10, 2004 | Deposit of Bank Check No. 499955637 ($60,000) and Bank Check No. 499955644 ($70,000) to Intrust Bank Account No. XXXXXX2025 (Stephen and Linda Schneider) | $130,000.00 |

| Count | On or About Date | Monetary Transaction | Amount |
|-------|------------------|----------------------|--------|
| 26 | May 12, 2004 | Wire Transfer from Intrust Bank Account No. 110232025 (Stephen and Linda Schneider) to Bancomer Bank Account No. XXXXXX6336, Acapulco, Mexico | $130,000.00 |
| 27 | July 9, 2004 | Bank Money Order No. 116855 issued, from Schneider Medical Clinic to Linda Atterbury-Schneider, funded by Valley State Bank Account No. XXX571(Schneider Medical Clinic), deposited to Credit Union of America Account No. XXX678 (Atterbury/ Schneider) | $100,000.00 |
| 28 | July 16, 2004 | Check #1728 from Valley State Bank Account No. XXX571 (Schneider Medical Clinic Account) to Bob Moore Cadillac, Inc., for purchase of Hummer | $54,245.00 |
| 29 | Sept. 24, 2004 | Bank Money Order No. 117163 issued, from Schneider Medical Clinic to Linda Atterbury-Schneider, funded by Valley State Bank Account No. XXX571 (Schneider Medical Clinic) deposited to Credit Union of America Account No. XXX678 (Atterbury/ Schneider) | $90,000.00 |
| 30 | March 1, 2005 | Bank Money Order No. 118332 issued, from Schneider Medical Clinic to Linda Atterbury, funded by Valley State Bank Account No. XXX571(Schneider Medical Clinic), deposited to Credit Union of America Account No. XXX678 (Atterbury/Schneider) | $100,000.00 |
| 31 | June 9, 2005 | Bank Money Order #118912, from Linda Atterbury to Linda Atterbury, funded by Valley State Bank Account No. XXX571 (Schneider Medical Clinic), deposited to Credit Union of America Account No. XXX131 (L.E. & Ellen Atterbury) | $100,000.00 |
| 32 | Sept. 15, 2005 | Bank Check No. 614182 issued to L. E. Atterbury, funded by Credit Union of America Account No. XXX678 (Atterbury/Schneider), used to purchase Intrust Bank Certificate of Deposit  No. XXXXXX9001 in the name of L.E. Atterbury | $85,000.00 |

| Count | On or About Date | Monetary Transaction | Amount |
|-------|------------------|----------------------|--------|
| 33 | Jan. 6, 2006 | Bank Check No. 086739118 issued, from Lee Atterbury, payable to Linda Atterbury, funded by Intrust Bank Certificate of Deposit No. XXXXXX9001 (L.E. Atterbury), deposited to Valley State Bank Account No. XXX012 (Schneider Medical Properties) | $85,000.00 |
| 34 | Jan. 6, 2006 | Wire Transfer from Valley State Bank Account No. XXX012 (Schneider Medical Properties) to Union Bank of California Account No. XXXXXX6633 (Nationwide Beverage Bottling) | $100,000.00 |

134.   The foregoing is in violation of title 18, United States Code, Sections 2 and 1957.

## FORFEITURE ALLEGATIONS

## FORFEITURE – UNLAWFUL DISTRIBUTION AND DISPENSING OF CONTROLLED SUBSTANCES AND CONSPIRACY TO UNLAWFULLY DISTRIBUTE AND DISPENSE CONTROLLED SUBSTANCES

135.   Upon conviction of one or more of the controlled substances offenses alleged in Counts 1 through 6 of this Indictment, defendants, **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER**, shall forfeit to the United States, pursuant to 21 U.S.C. § 853, any property constituting or derived from proceeds obtained, directly or indirectly, as a result of these violations and any property used or intended to be used, in any manner or part, to commit or to facilitate the commission of these violations, including but not limited to, the following:

## A.     MONEY JUDGMENT

A sum of money equal to the amount of proceeds obtained as a result of the controlled substances offenses set out in Counts 1 through 6 for which the defendants are jointly and severally liable; and

**B.      REAL PROPERTY**

All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 7030 S. Broadway, Haysville, Kansas, more particularly described as: Lot 1, Block A, Grand Avenue Industrial Park to Haysville, Sedgwick County, Kansas; and

**C.      PERSONAL PROPERTY**

1.      Contents of account number XXX571, located at Valley State Bank, 5310 South Broadway, Wichita, Kansas, in the name of Schneider Medical Clinic;

2.      Contents of account number XXX012, located at Valley State Bank, 5310 South Broadway, Wichita, Kansas, in the name of Schneider Medical Properties, L.L.C.;

3.      Contents of account number XXXX XXXX 0429, located at Bank of America, 100 North Broadway, Wichita, Kansas, in the name of Stephen J. Schneider, D.O., or Linda Atterbury Schneider;

4.      Contents of account number XXX678, located at Credit Union of America, 5055 South Broadway, Wichita, Kansas, in the name of Linda K. Atterbury or Stephen Schneider, payable on death to Zoyie and Jena Schneider;

5.      Contents of account number XXX131 located at Credit Union of America, 5055 South Broadway, Wichita, Kansas, in the name of Lee E. Atterbury and Ellen Atterbury;

6.      2004 Hummer H2, Vehicle Identification Number (VIN): 5GRGN23U34H106071;

7.      2002 Nissan Frontier, Vehicle Identification Number (VIN): 1N6MD29Y52C312338;

8.      1995 GMC Jimmy SLT, Vehicle Identification Number (VIN): 1GKDT13W1S2519603; and

9.      Kansas Board of Healing Arts, Doctor of Osteopathy, Professional License Number 0522385 issued to Stephen J. Schneider.

## FORFEITURE – HEALTH CARE FRAUD AND CONSPIRACY TO COMMIT HEALTH CARE FRAUD

136.    Upon conviction of one or more of the health care fraud offenses alleged in Counts 1, and 7 through 17 of this Indictment, defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER**, shall forfeit to the United States of America, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses. The property to be forfeited includes, but is not limited to, the following:

**A.    MONEY JUDGMENT**

A sum of money equal to the amount of proceeds obtained as a result of the health care fraud offenses set out in Counts 1, and 7 through 17, for which the defendants are jointly and severally liable; and

**B.    REAL PROPERTY**

All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 7030 S. Broadway, Haysville, Kansas, more particularly described as: Lot 1, Block A, Grand Avenue Industrial Park to Haysville, Sedgwick County, Kansas; and

**C.    PERSONAL PROPERTY**

1.    Contents of account number XXX571, located at Valley State Bank, 5310 South Broadway, Wichita, Kansas, in the name of Schneider Medical Clinic;

2.    Contents of account number XXX012, located at Valley State Bank, 5310 South Broadway, Wichita, Kansas, in the name of Schneider Medical Properties, L.L.C.;

3.    Contents of account number XXXX XXXX 0429, located at Bank of America, 100 North Broadway, Wichita, Kansas, in the name of Stephen J. Schneider, O.D., or Linda Atterbury Schneider;

4.      Contents of account number XXX678, located at Credit Union of America, 5055 South Broadway, Wichita, Kansas, in the name of Linda K. Atterbury or Stephen Schneider, payable on death to Zoyie and Jena Schneider;

5.      Contents of account number XXX131 located at Credit Union of America, 5055 South Broadway, Wichita, Kansas, in the name of Lee E. Atterbury and Ellen M. Atterbury;

6.      2004 Hummer H2, Vehicle Identification Number (VIN): 5GRGN23U34H106071; and

7.      1995 GMC Jimmy SLT, Vehicle Identification Number (VIN): 1GKDT13W1S2519603.

## **FORFEITURE – MONETARY TRANSACTIONS**

137.    Upon conviction of one or more of the monetary transaction offenses alleged in Counts 1, and 18-34 of this Indictment, defendants **STEPHEN J. SCHNEIDER** and **LINDA K. SCHNEIDER**, shall forfeit to the United States of America, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in such offenses, and any property traceable to such property, including, but not limited to:

**A.      MONEY JUDGMENT**

A sum of money equal to the total amount of money involved in each offense for which the defendants are jointly and severally liable; and

**B.      PERSONAL PROPERTY**

1.      Contents of account number XXX678, located at Credit Union of America, 5055 South Broadway, Wichita, Kansas, in the name of Linda K. Atterbury or Stephen Schneider, payable on death to Zoyie and Jena Schneider;

2.      Contents of account number XXX131 located at Credit Union of America, 5055 South Broadway, Wichita, Kansas, in the name of Lee E. Atterbury and Ellen M. Atterbury;

3.      Contents of account number XXXXXX6336 located at Bancomer Bank, Acapulco, Mexico, in the name of Linda K. Atterbury; and

4.    2004 Hummer H2, Vehicle Identification Number (VIN): 5GRGN23U34H106071.

## FORFEITURE ALLEGATION
## SUBSTITUTE PROPERTY

138.   If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to, or deposited with, a third party;

(c)    has been placed beyond the jurisdiction of the court;

(d)    has been substantially diminished in value; or

(e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other property of said defendants up to the value of the forfeitable property described above, including but not limited to the following:

1.    All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 224 West 79th Street South, Haysville, Kansas, more particularly described as: Beginning at the Southwest corner of the Southeast Quarter; thence East 254 feet; thence North 994.68 feet; thence West 254 feet; thence South 994.68 feet to point of beginning except South 514.49 feet thereof, all in Section 5, Township 29 South, Range 1 East of the 6th P.M., Sedgwick County, Kansas;

2.    All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, described as:  All that part of the Northeast 1/4 Southwest 1/4 of Section 21, Township 34 North, Range 23 East of the Indian Base and Meridian in Delaware County, Oklahoma, being more fully described as follows:  Commencing at the Northwest corner of said Northeast 1/4 Southwest 1/4; thence South 43° 42' East a distance of 57.45 feet; thence South 38° 00' East a distance of 236.7 feet; thence South 02° 30' East a distance of 194.4 feet; thence

67

South 09° 30' West a distance of 160.00 feet; thence South 18° 00' West a distance of 129.7 feet to the point of beginning; thence South 80° 14' East a distance of 131.2 feet; thence South 12° 00' West a distance of 67.30 feet; thence South 25° 16' East a distance of 159.28 feet; thence South 32° 48' West a distance of 202.62 feet; thence South 70° 27' West a distance of 67.9 feet; thence North 21° 10' West a distance of 210.43 feet; thence North 00° 54' West a distance of 227.28 feet; thence North 88° 20' East a distance of 69.80 feet to the point of beginning.  Subject to covenants, easements, and restrictions;

3.　　All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at Calle Vista de la Neblina, #34, Brisamar fractioning, Acapulco, Guerrero, Mexico, more particularly described as: Lots 34A, Manzana 3, Brisamar Norte fractioning, Acapulco, Guerrero, Mexico;

4.　　1966 Chevrolet Corvette, Vehicle Identification Number (VIN): 194376S107506;

5.　　1992 Bayliner Bowride 19'10", VIN: B1YC44CXC292;

6.　　1987 Bayliner 19', VIN: BJYB29CXH687;

7.　　E*Trade account number XXXX-1295 in the name of Stephen Schneider and Linda Schneider;

8.　　Allianz Life Insurance Company of North America, account number DA717775 64915 in the name of Linda Schneider;

9.　　Jackson National Life Insurance Company, account number 72127170 in the name of Stephen J. Schneider;

10.　　Midland National Life Insurance Company, account number 8500226827 in the name of Stephen J. Schneider;

11.　　Contents of account number XXXXXX6336 located at Bancomer Bank, Acapulco, Mexico, in the name of Linda K. Atterbury;

12.　　Contents of account number XXXX40004, located at Mid American Credit Union, 8404 West Kellogg Drive, Wichita, Kansas, in the name of Stephen J. Schneider and Linda  Schneider.

A TRUE BILL.


 March 3, 2010                    s/Foreperson
DATE                             FOREPERSON OF THE GRAND JURY


s/Tanya J. Treadway, #13255 for
LANNY WELCH
United States Attorney
District of Kansas
301 N. Main, Suite 1200
Wichita, KS   67202

(It is requested that trial be held in Wichita, Kansas)